**John C. BABCOCK, Plaintiff–Appellant,**

**v.**

**R.L. WHITE and G. McDaniel, Defendants–Appellees.**

No. 94–3806.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1996.

Decided Dec. 9, 1996.

Harold J. Krent (argued), Chicago–Kent College of Law, Chicago, IL, for Plaintiff–Appellant.

Thomas E. Kieper (argued), Office of the United States Attorney, Indianapolis, IN, for Defendants–Appellees.

Before CUDAHY, COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

John Babcock is living proof of the dangers that prison gangs pose to inmates, and of the logistical nightmare they create for prison administrators. Serving a thirty-five-year sentence at the United States Penitentiary at Leavenworth, Kansas, Babcock was stabbed seven times in an attack by members of a gang known as the Mexican Mafia. Follow-ing this assault, Babcock was transferred to the United States Penitentiary at Terre Haute, Indiana ("USP–Terre Haute")—a facility supposedly free of Mexican Mafia members. Upon his arrival, however, Babcock became afraid for his life when he discovered that he had not escaped the reaches of the gang. This suit, filed pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), alleges that prison officials at USP–Terre Haute violated his rights under the First, Fifth, and Eighth Amendments by their response (or lack thereof) to Babcock's pleas for protection. The United States District Court for the Southern District of Indiana granted the defendants' motion for summary judgment. We affirm in part, reverse in part, and remand for further proceedings.

## I.

Read in the light most favorable to Babcock, the record presents a troubling picture, one that tends to become obscured in the bureaucratic prison-speak with which the defendants meet his allegations. Following the attack on his life, the Bureau of Prisons ("BOP") classified Babcock as a "separation" case within the Central Inmate Monitoring ("CIM") System. *See* 28 C.F.R. §§ 524.70–524.78 (1992). The regulations in place at the time defined separation cases as "[i]nmates who may not be confined in the same facility with other specified individuals," 28 C.F.R. § 524.72(g) (1992),[1] and Babcock received notice to the effect that he would "not be housed with other specific individuals while in the custody of the Bureau of Prisons." The notice continued, "You require separation from the Disruptive Group, Mexican Mafia." In order to realize this separation, Babcock was transferred to USP–Terre Haute on July 14, 1992.

According to Babcock's complaint, USP–Terre Haute was not the haven he anticipated. Babcock claims that defendant White, the intake officer who interviewed him upon

1. Subsequent to the events at issue here, the regulations were amended, apparently to allow for greater flexibility. Under the regulations now in place, separation cases "may not be confined in the same institution (unless the institu-tion has the ability to prevent any physical contact between the separatees) with other specified individuals...." 28 C.F.R. § 524.72(f) (1996). See *Central Inmate Monitoring (CIM) System*, 61 Fed.Reg. 40,142 (1996).

his arrival, informed him that USP–Terre Haute did indeed house members of the Mexican Mafia, "but mostly just a lot of 'wannabes' "—prisoners who aspired to gang membership. (The defendants now insist that there "were no active confirmed members of the Mexican Mafia located at USP–Terre Haute," although their own submissions concede that "there may be inmates housed at USP, Terre Haute, who are separated from these groups or who are sympathizers or 'wannabees'.") White nevertheless told Babcock to enter the general population with what, to Babcock, must have seemed rather glib advice: "Just keep your eyes open." That very same day, Babcock refused his assignment, preferring the more severe restrictions of administrative detention in a special housing unit to the certain harm that he believed he faced in the general population. The defendants emphasize that Babcock was not disciplined for refusing to enter the general population, but it does appear that his behavior provoked a Unit Discipline Committee ("UDC") hearing, which was suspended pending the outcome of a protective custody investigation. Babcock remained in administrative detention for the remainder of his stay at USP–Terre Haute.

The tradeoff between comfort and security, unpalatable as it was, did not materialize once Babcock moved to administrative detention. At the UDC hearing, conducted in mid-July, Babcock reported spotting two Mexican Mafia members in the recreation yard.[2] Later that month, defendant McDaniel, a unit manager and UDC member investigating Babcock's claim for protection, showed Babcock photographs of Hispanic inmates housed at USP–Terre Haute and asked him to identify the individuals he claimed to have seen. Babcock selected the picture of an inmate named "Vargas." Babcock asserts that McDaniel acknowledged at the time that this was the notorious Vargas we described as an active *United States v. Silverstein,* 732 F.2d 1338 (7th Cir.1984),

*cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985), and that Babcock's Vargas indeed sported a tattoo denoting membership in the Mexican Mafia. McDaniel denies that he ever made any such representation concerning Vargas's identity, and adds that the "Vargas" Babcock selected "was not a confirmed, active member of the Mexican Mafia." At this stage of the proceedings, we must assume that "Vargas" was the Vargas Babcock claims he was. This Vargas allegedly was housed only three cells away from Babcock, but Vargas's proximity was not the only reason for Babcock's concern. Babcock claims that he received threats from other inmates and that, on one occasion, scalding water was thrown into his cell. So afraid was Babcock that he remained in his cell during the one hour of recreation allowed prisoners in administrative detention.

Availing himself of BOP grievance procedures, Babcock repeatedly sought transfer to a facility free of Mexican Mafia members or affiliates—a request frustrated by the initial prison investigation's conclusion in July 1992 that Babcock should be classified as an "unverified protection case." Babcock claims that in October he handed McDaniel a letter, subsequently ignored, informing him of threats Babcock had received and requesting a meeting "about my protection needs." In November, the warden at USP–Terre Haute informed Babcock that he would be "continually housed in Administrative Detention until we are able to obtain information which would support the need for verified protection status." When, on one occasion, Babcock called McDaniel to his cell to ask why he had been placed in this state of limbo, McDaniel allegedly suggested, "Maybe you ought to stop filing all that shit," which Babcock understood as a reference to appeals he had made within the prison system and to lawsuits he had filed against the BOP. McDaniel's advice proved unsound, however, for in December 1992 Regional Director In-

---

**2.** It appears that Babcock was separated from the alleged gang members at the time he observed them. In his complaint, Babcock claimed that he told the UDC "that he had seen two members of the Mexican Mafia from whom he is separated and who would carry out the death contract against him." McDaniel elaborated on the UDC hearing in his affidavit: "[Babcock] claimed to have seen two affiliates of this group [the Mexican Mafia], who were in the institution recreation yard while plaintiff was in the Administrative Detention/Segregation Yard." The precise details of this episode, however, do not affect our holding.

gram informed Babcock that he had asked "staff at Terre Haute to further evaluate your protection needs." On May 27, 1993, after more than ten months in administrative detention at USP–Terre Haute, Babcock was transferred to USP–Atlanta.

Babcock filed this suit against the BOP, White and McDaniel on August 26, 1993, seeking $35,000 in compensatory damages, $50,000 in punitive damages, and injunctive relief. His complaint alleged that the defendants exhibited deliberate indifference to his safety, in violation of the Eighth Amendment, by knowingly incarcerating him with members of the Mexican Mafia despite his classification as a separation case; that mandatory federal regulations created a protected liberty interest, under the Due Process Clause, in not being housed with members of the group that had sworn to kill him; and that the defendants, in violation of Babcock's First Amendment rights, retaliated against him for seeking redress within the prison system and the courts. On November 5, 1993, the district court dismissed Babcock's action against the BOP based on that entity's immunity from suit. The court also determined that, as a result of Babcock's transfer to Atlanta, it lacked jurisdiction to hear his claim for injunctive relief. On September 30, 1994, without permitting discovery, the district court dismissed Babcock's case in its entirety. In granting the defendants' motion for summary judgment, the court addressed itself only to the merits of Babcock's Eighth Amendment claim. As an alternative basis for dismissal, the court held that the defendants were entitled to the defense of qualified immunity. At the time Babcock filed his notice of appeal, he was a prisoner in Talladega, Alabama.

## II.

We review *de novo* the district court's grant of summary judgment and will affirm only if the record indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We of course read the record in the light most favorable to Babcock, the nonmoving party, and afford him the benefit of all

reasonable inferences. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996). Because there was no discovery below, the record consists primarily of pleadings and affidavits, along with certain correspondence relating to Babcock's appeals within the BOP's administrative grievance process. With these materials before us, we turn to Babcock's claims under the Eighth, Fifth, and First Amendment, respectively

### A.

Babcock's Eighth Amendment claim presents a unique situation. The danger to which he allegedly was exposed—attacks by Mexican Mafia members or "wannabes"— never materialized. Moreover, Babcock does not complain to this court of an ongoing violation of his constitutional rights: the district court dismissed Babcock's claim for injunctive relief for the very reason that he had been transferred from USP–Terre Haute by the time he filed suit, and Babcock does not appeal this ruling. This case thus squarely presents the question whether or not a federal prisoner who was not assaulted by, and who is no longer at risk from, fellow inmates may nevertheless maintain a *Bivens* claim for money damages based solely on prison officials' past failure to take measures to protect the prisoner from inmates known to pose a danger to the prisoner. Our answer is "no," at least where, as here, exposure to risk of harm cannot be said to result from an official's malicious or sadistic intent.

Both parties correctly identify the standard that governs a prison official's duty under the Eighth Amendment to protect inmates from attacks at the hands of fellow inmates. In *Farmer v. Brennan*, a case involving a USP–Terre Haute prisoner who allegedly was assaulted by a cellmate, the Supreme Court reiterated that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." 511 U.S. 825, ——, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994). The Court defined "deliberate indifference" as requiring a showing that the official was "subjectively aware" of the risk: "a prison official may be held liable under the Eighth Amendment for denying humane con-

ditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." 511 U.S. at ——, ——, 114 S.Ct. at 1974, 1984. Consequently, the parties in this case devote much of their briefs to a discussion of whether Babcock can satisfy both the objective (substantial risk of serious harm) and the subjective (knowing disregard) component of the test elaborated in *Farmer*. Were we of the view that the sole issue raised by Babcock's Eighth Amendment claim was whether the defendants' conduct met the requirements of *Farmer*, we might be inclined to agree with Babcock that the district court was too hasty in granting summary judgment without further discovery. *See Farmer v. Brennan*, 81 F.3d 1444 (7th Cir.1996). We believe, however, that by focusing exclusively on the defendants' obligations under the Eighth Amendment both parties neglect a crucial aspect of this case.

It is elucidating to consider *Farmer* in light of certain well-worn principles of tort law, which generally recognizes a damages claim only when a defendant breaches a duty owed to a plaintiff, and the breach causes cognizable legal harm to the plaintiff. *See Carey v. Piphus*, 435 U.S. 247, 254–55, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978) (" 'The cardinal principle of damages in Anglo–American law is that of *compensation* for the injury caused to plaintiff by defendant's breach of duty.' ") (citing 2 F. Harper & F. James, Law of Torts § 25.1, at 1299 (1956) (emphasis in original)). We read *Farmer* as speaking to the *duty* owed by prison officials in failure-to-protect cases. *Farmer* is largely silent as to the injury element, presumably because in that case, the injury was clear: Farmer allegedly had been raped and beaten as a result of the defendants' breach of their

duty not to knowingly subject him to a substantial risk of serious harm.[3] Obviously, however, a *Bivens* action is no ordinary tort. In a *Bivens* action, the harm alleged is a violation of a particular constitutional right— here, the right to be free from cruel and unusual punishment. But to end our analysis on this note would be question-begging. We still must endeavor to locate the boundaries of the Eighth Amendment's vague proscription. We do so in this case by asking the following question: When officials knowingly and unreasonably house a prisoner with inmates who pose a substantial risk to his safety, what harm must actually befall the prisoner before a court may say that he is entitled to monetary compensation for a violation of his Eighth Amendment rights?

One answer would be that no harm need be shown, that at least nominal damages are presumed in such a case. This approach does not strike us as appropriate to the Eighth Amendment context. *Cf. Carey*, 435 U.S. at 266–67, 98 S.Ct. at 1054 ("Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions ..., we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury."). Unlike the right to procedural due process, the right to be free from cruel and unusual punishment is not " 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions," *id.* In any event, we do not understand this to be Babcock's position. Fairly read, Babcock's complaint alleges that he suffered severe psychological distress as a result of finding himself in the proximity of those who would kill him if given the opportunity. In Babcock's words, "McDaniel's actions ... caus[ed] plaintiff to suffer personal humilia-

---

**3.** We note that every failure-to-protect case cited by the Court in *Farmer* involved either actual violence, see *Young v. Quinlan*, 960 F.2d 351 (3d Cir.1992); *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556 (1st Cir.), cert. denied, 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988); *Goka v. Bobbitt*, 862 F.2d 646 (7th Cir.1988); *Roland v. Johnson*, 856 F.2d 764 (6th Cir.1988); *Morgan v. District of Columbia*, 824 F.2d 1049 (D.C.Cir.1987); *Pressly v. Hutto*, 816 F.2d 977 (4th Cir.1987); *Berg v. Kincheloe*, 794 F.2d 457

(9th Cir.1986); *Villante v. Department of Corrections*, 786 F.2d 516 (2d Cir.1986); *Martin v. White*, 742 F.2d 469 (8th Cir.1984), an effort to remedy continuing threats to safety, see *Alberti v. Klevenhagen*, 790 F.2d 1220 (5th Cir.1986); *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980), or a combination of the two, see *LaMarca v. Turner*, 995 F.2d 1526 (11th Cir.1993). See *Farmer*, 511 U.S. at —— & n. 2, 114 S.Ct. at 1976–77 & n. 2.

tion and sever[e] mental anguish and distress."

However legitimate Babcock's fears may have been, we nevertheless believe that it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment. Babcock's claim of psychological injury does not reflect the deprivation of "the minimal civilized measures of life's necessities," *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399–2400, 69 L.Ed.2d 59 (1981), that is the touchstone of a conditions-of-confinement case. Simply put, Babcock alleges, not a "failure to prevent harm," *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1977, but a failure to prevent exposure to risk of harm. This does not entitle Babcock to monetary compensation. *See Carey*, 435 U.S. at 258–59, 98 S.Ct. at 1050 ("In order to further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question—just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law.").

The Court's approach in *Farmer* supports our conclusion. In *Farmer*, the Court rejected the notion that its insistence on a subjective test for deliberate indifference would "require prisoners to suffer physical injury before obtaining court-ordered correction of objectively inhumane prison conditions." 511 U.S. at ——, 114 S.Ct. at 1983. The Court pointed out that in a suit for injunctive relief, the subjective factor must be determined with reference to defendants "attitudes and conduct at the time suit is brought and persisting thereafter." *Id.* Therefore, a prison official could never defend against a suit for an injunction based on the official's ignorance

of a condition that was ongoing. 511 U.S. —— & n. 9, 114 S.Ct. at 1983 & n. 9. A corollary of this reasoning, however, was that prison officials could defend against such a suit "by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation." *Id.* at n. 9. *Farmer* thus provides an incentive for prison officials to acknowledge intolerable safety risks and to eliminate them before tragedy strikes. This incentive is undermined if a prison official believes that by recognizing dangers and taking precautionary measures, he thereby exposes himself to liability for the psychological injury suffered by the prisoner prior to the official's adoption of those measures.[4]

There is also a more fundamental sense in which the distinction between the forward-looking relief afforded by an injunction and the backward-looking relief provided by a damages award informs our understanding of the Eighth Amendment's command. It is true that in deciding whether an inmate should recover damages based on prison officials' failure to protect that inmate, the court must perform an *ex ante* determination. Despite the fact that injury did occur, the court must ask whether, prior to the actual occurrence, the risk that such injury would result was "substantial" and whether the officials knew of the risk. At the same time, damages essentially compensate for past injury. *See Carey*, 435 U.S. at 254–57, 98 S.Ct. at 1047–49. The inquiry into *ex ante* risks does not obviate the need to decide whether the injury alleged is serious enough to entitle the plaintiff to compensation under the Eighth Amendment. By way of contrast, the injunction seeks to prevent imminent harm. If, as *Farmer* insists, an injunction is available to a prisoner "to prevent a substantial risk of

---

4. We note that *Bivens* itself was decided with a due regard for the ability of the federal courts to decide the appropriateness, in particular circumstances, of monetary relief. See *Bivens*, 403 U.S. at 396, 91 S.Ct. at 2004–05 ("The present case involves no special factors counselling hesitation in the absence of affirmative action by Congress."). Indeed, this was the thrust of Justice Harlan's concurrence in *Bivens*: "The question

then, is ... whether compensatory relief is 'necessary' or 'appropriate' to the vindication of the interest asserted.... In resolving that question, it seems to me that the range of policy considerations we may take into account is at least as broad as the range ... a legislature would consider with respect to an express statutory authorization of a traditional remedy." *Id.* at 407, 91 S.Ct. at 2010.

serious injury *from ripening into actual harm*," 511 U.S. at ——, 114 S.Ct. at 1983 (emphasis added), the implication is that the "actual harm" to be prevented is an assault upon the prisoner.

It is essential to stress the narrow scope of our holding today, which applies only to allegations that prison officials exposed an individual prisoner to a risk of violence at the hands of other inmates. For reasons emphasized above, our decision does not cover suits to enjoin continuing disregard for prisoners' safety. Nor do we intend to preclude suits by prisoners under the Eighth Amendment grounded solely on claims of psychological injury. As Justice Blackmun observed in his concurrence to *Hudson v. McMillian*, "It is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment.... [T]he Eighth Amendment prohibits the unnecessary and wanton infliction of 'pain,' rather than 'injury.' ... 'Pain' in its ordinary meaning surely includes a notion of psychological harm." 503 U.S. 1, 16, 112 S.Ct. 995, 1004, 117 L.Ed.2d 156 (1992) (Blackmun, J., concurring); *cf. Carey*, 435 U.S. at 263, 98 S.Ct. at 1052 ("[W]e foresee no particular difficulty in producing evidence that mental and emotional distress actually was caused by the denial of procedural due process itself.").

Nonetheless, the Supreme Court has indicated that "[w]hat is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishments Clause depends upon the claim at issue.... The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. at 8, 112 S.Ct. at 1000 (citing *Estelle v. Gamble*, 429 U.S. at 103, 97 S.Ct. at 290). As a result, the Court has insisted upon the distinction between excessive force claims and conditions-of-confinement claims, such as the claim presented by Babcock. "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." *Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000. This is not true, however, in excessive force cases, where prison officials are held, not to a deliberate indifference standard, but to the less intrusive standard announced in *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S.Ct. 1078, 1084–85, 89 L.Ed.2d 251 (1986). The *Whitley* standard asks whether force was applied "maliciously and sadistically." *See Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000. In Hudson, therefore, the Court held that a prisoner who claims that prison officials used excessive force need not allege "significant injury" in order to survive dismissal.

At first glance, it might seem surprising that where a prisoner must establish a higher level of subjective culpability on the part of a prison official, the prisoner should carry a lighter burden with respect to the objective component of his claim. In *Hudson*, however, the Court explained the rationale behind this conclusion: "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." 503 U.S. at 9, 112 S.Ct. at 1000. In other words, the Constitution does not countenance psychological torture merely because it fails to inflict physical injury. Tellingly, the one example of psychological injury that Justice Blackmun offered in his Hudson concurrence—the result of a prison guard placing a revolver inside an inmate's mouth, 503 U.S. at 16, 112 S.Ct. at 1004—stemmed from exactly the kind of malicious and sadistic behavior that, in the majority's view, always offends contemporary standards of decency. As noted above, however, Babcock's claim that prison officials failed to protect him falls within the Court's conditions-of-confinement line of cases rather than its excessive force line of cases. *See Wilson v. Seiter*, 501 U.S. at 303, 111 S.Ct. at 2326–27 ("[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as ... the protection he is afforded against other inmates."); *Farmer*, 511 U.S. ——, 114 S.Ct. at 1977 (citing *Wilson*). His allegations of deliberate indifference do not exemplify the egregious conduct contemplated by Justice Blackmun. Babcock therefore has not alleged sufficient injury to entitle him to damages under the Eighth Amendment.

## B.

 Babcock also formulates a claim under the Fifth Amendment's Due Process Clause. In the district court, he argued that mandatory regulations and his classification as a separation case gave rise to a "liberty interest ... in not being confined in the same facility as an inmate from whom there is a separation." Alternatively, "[e]ven *assuming* plaintiff's life was not in danger ... he was still unnecessarily punished by being locked in a cell for 24 hours a day ... for ten and a half months ... since if the above mentioned explicitly mandatory regulations would have been followed plaintiff would have been quickly transferred...." An additional consequence of this delay, according to Babcock, was that his fear of entering the general population prevented him from earning good-time credits.

Babcock's due process arguments are premised on the notion that his confinement at USP–Terre Haute violated certain mandatory regulations. Regardless of what the regulations required (a matter we do not decide), Babcock's CIM classification could give rise to a protected liberty interest only if to house him in a particular institution would "impose[ ] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner,* — U.S. —, —, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995); *see also Crowder v. True,* 74 F.3d 812, 814 (7th Cir.1996) ("While Sandin addressed state-created liberty interests under the Fourteenth Amendment, its methodology applies equally to Fifth Amendment claims involving federal prison regulations."). An inmate generally has no constitutionally protected liberty interest in being confined in a particular prison. *See Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *King v. Fairman,* 997 F.2d 259, 262 n. 4 (7th Cir.1993) (citing *Meachum* ); *see also Sandin,* — U.S. at —, 115 S.Ct. at 2300 ("The time has come to return to the due process principles we believe were correctly established and applied in ... *Meachum.*"). Moreover, in *Higgason,* we concluded that, because good-time credits do not "inevitably affect the duration of [the] sentence," *Sandin,* — U.S. at —, 115 S.Ct. at 2302, "denying the opportunity to earn credits ... did not infringe on a protected liberty interest." *Higgason,* 83 F.3d at 807. To the extent that Babcock attempts to refurbish his substantive Eighth Amendment claim by arguing that disregard of regulations created an intolerable safety risk, we feel that this issue must be resolved with reference to the Eighth Amendment standards discussed above. *See Higgason,* 83 F.3d at 809; *Lunsford v. Bennett,* 17 F.3d 1574, 1583 (7th Cir.1994).

Babcock's alternative due process claim—that although administrative detention may have been tolerably safe, he should not have been put to the Hobson's choice between safety and comfort—is inventive but unpersuasive. Babcock admittedly may have seen no alternative to administrative detention in light of the presence of Mexican Mafia members. We believe, however, that where an inmate has elected to enter administrative detention as the best alternative given an arguably improper (though not unconstitutional) prison assignment, it would be both illogical and unwise for a court to declare, after the fact, that the inmate's election gave rise to a deprivation of a protected liberty interest.[5]

## C.

 Babcock's First Amendment claim is an entirely different matter. His com-

---

5. This case therefore does not call upon us to decide at what point (if ever) a prisoner's extended confinement in administrative detention would amount to an "atypical and significant hardship" within the meaning of Sandin. Cf. *Bryan v. Duckworth,* 88 F.3d 431, 433 (7th Cir. 1996) (noting that "Sandin involved only 30 days of segregation" and that "if conditions in segregation were considerably harsher than those of the normal prison environment ... then a year of it might count as a deprivation of liberty where a few days or even weeks might not"). But see *Crowder,* 74 F.3d at 815 ("[T]he periodic review of administrative detention ... does not create a constitutionally protected liberty interest."). See also *Anderson v. Romero,* 72 F.3d 518, 527 (7th Cir.1995) ("To deny a prisoner all opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed out of his cell for even a short time.").

plaint alleges that "McDaniel's actions ... were in retaliation for plaintiff's use of the 'inmate grievance system' and previous lawsuits against B.O.P. officials," and that "McDaniel[ ] classified plaintiff as an 'unverified protection case' knowing that by classifying plaintiff as such plaintiff would be confined to the institution's segregation unit where he would be locked in a cell 23 hours a day for at least one year." If believed, the claim that McDaniel prevented an expeditious transfer in order to retaliate against Babcock for exercising his constitutional rights would entitle Babcock to damages. *See Higgason v. Farley*, 83 F.3d 807, 810 (7th Cir.1996) ("If a prisoner is transferred for exercising his own right of access to the courts, or for assisting others in exercising their right of access, he has a claim under § 1983."); *see also Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995) ("We ... hold that the retaliation cause of action ... survives Sandin."). This is true, moreover, even if McDaniel's actions did not independently violate the Constitution. *See Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984), *limited on other grounds, Salazar v. City of Chicago*, 940 F.2d 233, 240–41 (7th Cir.1991). "To succeed on his retaliation claim, [Babcock] need not establish an independent constitutional interest in either assignment to a given prison or placement in a single cell, because the crux of his claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities." *Pratt*, 65 F.3d at 806 (emphasis in original). Yet the district court did not address Babcock's retaliation claim. Because we believe that summary judgment on this claim is inappropriate on the record before us, we must remand to the district court. Without expressing any view as to Babcock's ultimate chance of success, we offer the following observations, which may guide the court in its handling of the retaliation question.

Babcock's burden is high. He of course must establish that his protected conduct was a motivating factor behind any delay, but that should not end the inquiry. Because the ultimate question is whether events would have transpired differently absent the retaliatory motive, *see Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), it will not suffice for Babcock to show that McDaniel's desire to retaliate played a substantial part in Babcock's continued confinement at USP–Terre Haute. McDaniel's alleged suggestion "to stop filing all that shit" may have reflected the dark humor of a jaded official, or it may have bespoken more sinister intent, but regardless of McDaniel's state of mind, there is no claim if McDaniel can show that Babcock nevertheless would have remained at USP–Terre Haute for the same duration. In addition, we agree with the Ninth Circuit that the retaliation inquiry should be undertaken in light of the "general tenor" of *Sandin*, which "specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management." *Pratt*, 65 F.3d at 807. "[W]e should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (citing *Sandin*, —— U.S. at ——, 115 S.Ct. at 2299). From all that appears, the prison's administrative grievance process may indeed have operated with all the deliberate speed of which it is capable.

Nevertheless, we firmly believe that the courts should not blithely proclaim their readiness to enjoin dangerous prison conditions, *see Farmer*, 511 U.S. at —— ——, 114 S.Ct. at 1983–84, and at the same time turn a blind eye to claims that prison officials have retaliated against inmates for exercising their right to seek judicial remedy. "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). In their responsive brief in this court, the defendants argue that Babcock's allegations are factually impossible: McDaniel could not have misclassified Babcock as an unverified protection case in July 1992 in retaliation for Babcock's filing grievances, because Babcock did not appeal his classification to the warden until October 1992. That argument, though, does not rule out the possibility that McDaniel misclassified Babcock for initiating the protective custody investigation in the first place, or that McDaniel intentionally ignored

new evidence of danger after Babcock appealed to the warden. Summary judgment is inappropriate while the record remains a "swearing contest." *Higgason*, 83 F.3d at 810–11. We note, however, that Babcock's retaliation charge targets only defendant McDaniel, and that all claims against White were therefore properly dismissed.

■ Our conclusion that Babcock states a claim under the First Amendment compels us to address an alternative ground for dismissal adopted by the district court, which held that the defendants were entitled to qualified immunity. Under *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), governmental officials performing discretionary functions are entitled to qualified immunity from liability arising out of conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow also indicated that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed," *id.* at 818, 102 S.Ct. at 2738, and it seems likely that the district court's reluctance to permit discovery resulted from its recognition of the immunity defense.

While we share the district court's concern "to avoid disruption of government," *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, and recognize that Babcock's remaining claim ultimately may be resolved on summary judgment, we cannot agree that McDaniel is entitled to qualified immunity. The federal courts have long recognized a prisoner's right to seek administrative or judicial remedy of conditions of confinement, *see Lewis v. Casey*, —— U.S. ——, ——, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996), as well as the right to be free from retaliation for exercising this right. *See Matzker v. Herr*, 748 F.2d 1142, 1150–51 (7th Cir.1984); *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir.1978); *see also Penrod v. Zavaras*, 94 F.3d 1399, 1404–05 (10th Cir. 1996) ("[Q]ualified immunity ... does not apply in this case because the jurisprudence prohibiting retaliatory acts against prisoners for reporting grievances is well-established."). In the instant case, moreover, qualified immunity cannot be premised on the rationale that a particular form of retaliation has yet to be condemned by the courts. As discussed above, retaliation against constitutionally protected conduct is actionable regardless of whether the defendant's actions independently violate the constitution. A prison official in McDaniel's position therefore would have been on notice that *any* retaliation, whatever its shape, could give rise to liability. *Harlow*'s standard of objective reasonableness does not require that "the very action in question has previously been held unlawful," but only that "in light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The qualified immunity defense simply does not dispose of Babcock's retaliation claim.

### III.

To conclude: Babcock complains he endured cruel and unusual punishment by being exposed to risk of harm from fellow inmates. Yet because he was not assaulted, and because the issue of present danger is not before us, he does not state a claim for relief under the Eighth Amendment. Babcock claims that the defendants violated his liberty interest in being housed in a facility free of Mexican Mafia members, where he could safely enter the general population. But because he did not suffer an "atypical and significant hardship in relation to the ordinary incidents of prison life," he does not state a claim under the Due Process Clause. Babcock also claims, however, that defendant McDaniel impeded his transfer to another facility in retaliation for Babcock's efforts to secure relief through the prison appeals process and the federal courts. If proved, this claim would entitle Babcock to relief. We therefore remand this case to the district court for further proceedings to determine whether Babcock can raise an issue of material fact as to his retaliation claim against defendant McDaniel.

AFFIRMED in part; REVERSED in part; and REMANDED.