121 F.3d 222
 Charles W. CLARKE, Plaintiff-Appellee-Cross Appellant,
v.
Richard L. STALDER, et al., Defendants,
Richard L. Stalder, Defendant-Appellant-Cross-Appellee,
Robert Tanner, Defendant-Appellee,
Captain Charles Moulard, Defendant-Appellee.
 No. 96-30313.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 9, 1997.
 
 Terry Edward Allbritton, Jane L. Johnson, New Orleans, LA, for Plaintiff-Appellee-Cross-Appellant.
 Cary A. DesRoches, New Orleans, LA, Richard A. Fraser, III, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Defendant-Appellant-Cross-Appellee.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before REYNALDO G. GARZA, EMILIO M. GARZA and DeMOSS, Circuit Judges.
 REYNALDO G. GARZA, Circuit Judge:
 
 
 1
 This civil rights case presents us with cross appeals from a final judgment entered by a magistrate judge after a bench trial. For the reasons assigned, we affirm in part and vacate and remand in part.
 
 I. Background
 
 2
 Charles Clarke is, and has been at all relevant times, an inmate in the Louisiana prison system. He is currently incarcerated at the Louisiana State Penitentiary in Angola. The events which form the basis of this lawsuit began while he was imprisoned at the Work Training Facility at Pineville, commonly known as Camp Beauregard.
 
 
 3
 On August 16, 1992, Clarke was returning to his cell when he stopped to talk to another inmate who was sweeping the floor. This other inmate apparently did legal work for Clarke and Clarke wanted to discuss this with him. Captain Charles Moulard, a guard at the prison, ordered Clarke to stop interfering with the other inmate's sweeping. He gave Clarke the option of being sent to his cell or sweeping walkways the rest of the day; Clarke chose the latter option. Some time later, Moulard returned and accused Clarke of swinging his broom too high. He ordered Clarke to return with him to the prison's control center and informed him there that his sweeping technique would lead to his being punished. At this point, Clarke told Moulard that he would file an "ARP", an administrative complaint, against Moulard for ordering him to do extra work without a disciplinary board hearing on the matter.[1] He also told Moulard he would initiate legal proceedings against him. Moulard issued a disciplinary report against Clarke, charging a violation of Rule 3 of the Louisiana Department of Public Safety and Corrections' Disciplinary Rules and Procedures for Adult Prisoners ("Rules"). This rule provided[2] as follows:
 
 
 4
 DEFIANCE (Schedule B): No prisoner shall commit or threaten physically or verbally to commit bodily harm upon an employee. No prisoner shall curse an employee or insult his family in the employee's presence. No prisoner shall threaten an employee in any manner, including threatening with legal redress during a confrontation situation (this does not mean telling an employee of planned legal redress outside a confrontation situation and certainly does not mean the actual composition or filing of a writ, suit, etc.; threatening to write to the Secretary, the Warden or other institutional officers is not a violation). No prisoner shall obstruct or resist an employee who is performing his proper duties. No prisoner shall try to intimidate an employee to make the employee do as the prisoner wants him to do.
 
 
 5
 Penalties for a violation of this rule include up to ten days of isolation, change to higher custody status (e.g., from minimum- to medium-security), a recommendation for transfer to another institution, or loss of good-time credits.
 
 
 6
 In his charge, Moulard described the incident as follows: "On the above date and time the above inmate was interfering with inmates assigned to extra duty. I Capt. Moulard called inmate Clark [sic] to C/C to talk to him. I told him I was going to write him up for interfering with the inmates. Inmate Clark became belligerent [sic] and told me he was going to file a lawsuit and an ARP [administrative complaint] on me and that he was going to see who was going to win." Clarke was given a copy of the report and pled not guilty before a disciplinary board. The board determined otherwise. The board's report states that Clarke was found guilty because Moulard's report was clear and precise, Clarke had little or no defense, Clarke's credibility was low, and because he "admit[ted] he threatened legal redress during confrontation with staff." Clarke was punished with the loss of ten days of good-time credits and was transferred to Washington Correction Institution (WCI), a higher-security prison. He appealed the board's determination to Richard Stalder, the Secretary of the Department of Corrections, who affirmed the action.
 
 
 7
 Following his transfer to WCI, Clarke filed suit under 42 U.S.C. § 1983 in federal district court in New Orleans in 1993. He alleged that his prison conviction at Camp Beauregard violated his right to free speech and asked for damages and the return of his lost good-time credits. He also challenged the facial constitutionality of the "no-threats-of-legal-redress" portion of Rule 3 and asked for an injunction against its enforcement. During the pre-trial period, prison officials at WCI subjected Clarke to a drug test which came back positive. Clarke denied using drugs and asked to be retested at his expense. When this request was denied, he sought and received a court order allowing him to be retested.[3] After this incident and another incident involving a phone call with his attorney that was cut short by prison officials, Clarke alleges prison officials engaged in a pattern of harassment in retaliation for his having sought court protection. Accordingly, he amended his complaint to allege a cause of action under § 1983 for this retaliation.
 
 
 8
 Pursuant to 28 U.S.C. § 636(c), the parties consented to the jurisdiction of a magistrate judge. The parties presented their case to the magistrate judge in the course of a two-day bench trial and then submitted post-trial memoranda. On March 19, 1996, the magistrate judge entered a final order and an accompanying opinion. She held that Rule 3 had been unconstitutionally applied to Clarke and ordered that his good-time credits be restored and that his prison record be purged of mention of the incident. She determined, however, that damages were inappropriate.[4] She also declined to order him transferred back to Camp Beauregard, instead deferring to the discretion of the State. She held the prohibition on threats of legal redress to be facially unconstitutional and enjoined its enforcement. With respect to Clarke's retaliation claim, she determined that the WCI guards were unaware of Clarke's lawsuit and thus did not act with retaliatory intent. Accordingly, she denied this claim. She finally determined the defendants were not liable to Clarke for damages under Louisiana law.
 
 
 9
 Both parties appeal. Clarke appeals the magistrate judge's refusal to award him any damages, even nominal damages, for the constitutional deprivation. He also appeals her holding that prison officials at WCI did not retaliate against him for exercising his right to access the courts.[5] Stalder appeals the magistrate judge's holding that any constitutional deprivation occurred and her holding that the "no-legal-redress" portion of Rule 3 is facially unconstitutional.[6]
 
 II. Application Challenge
 
 10
 We first address Clarke's claim that his punishment for speaking to Captain Moulard violated his right to free speech, as protected by the First and Fourteenth Amendments. Clarke was charged with violating Louisiana's defiance rule by threatening Captain Moulard with legal redress, by being "belligerent," and by threatening him with the words "we'll see who wins." He was found guilty by a prison disciplinary board and this finding was affirmed after an administrative appeal. He was punished with transfer to another prison and had accumulated good-time credits taken from him. Counsel for the State explained at oral argument that good-time credits count toward early release: when an inmate's time served plus accumulated good-time credits equal the amount of time he was sentenced to serve, the inmate is entitled to release. Thus, for Clarke, his conviction for the incident involving Captain Moulard in effect extended the term of his imprisonment by ten days. Clarke sought to recover these lost credits, as well as damages, by filing this § 1983 suit alleging that he had been punished for violating the "no threats of legal redress" portion of Rule 3 in violation of his First Amendment rights. The magistrate judge found in his favor on the merits and granted him most of the relief he requested.[7]
 
 
 11
 This was error. In Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court held that an inmate may not, by suing under § 1983, recover good-time credits lost in a prison disciplinary proceeding. It held that these credits may only be recovered via a writ of habeas corpus. Thus a prisoner must begin with available state remedies and then, if he has not been successful, may petition a federal court for the writ. The Court later held in Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), that an inmate may not sue for damages under 42 U.S.C. § 1983 for false arrest where a favorable ruling by a federal court would "necessarily imply" the invalidity of his conviction. The Court made clear that only after the inmate receives habeas relief may he seek damages under § 1983 for the government's unconstitutional act. The Court stated that the trial court should act as the gatekeeper, dismissing those prisoner suits incorrectly brought under § 1983. Id. at 487, 114 S.Ct. at 2372-73. Finally, the Court just revisited this area in Edwards v. Balisok, 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), in which it held, inter alia, that the Heck rule applies to prisoners attacking disciplinary proceedings which result in changes to their sentence, including the loss of accumulated good-time credits. We have adopted a simple rule for determining whether a prisoner must first obtain habeas relief: if a favorable determination would not automatically entitle the prisoner to accelerated release, the proper vehicle for suit is § 1983. If it would so entitle him, he must first get a habeas judgment. Orellana v. Kyle, 65 F.3d 29, 31 (5th Cir.1995), cert. denied, 516 U.S. 1059, 116 S.Ct. 736, 133 L.Ed.2d 686 (1996).
 
 
 12
 Clarke's claim is clearly barred by Preiser and Heck. Clarke claims he was found guilty of violating an unconstitutional rule and, therefore, that his conviction was illegal. He has not obtained habeas relief. This is precisely the type of claim that is remediable via a habeas proceeding and that is barred by Preiser and Heck when it is brought under § 1983. See, e.g., Preiser, 411 U.S. at 486, 93 S.Ct. at 1834 (where prisoner's "challenge to his custody is that the statute under which he stands convicted is unconstitutional, ... his grievance is that he is being unlawfully subjected to physical restraint" and thus habeas is his remedy); Leonard v. Nix, 55 F.3d 370, 373 (8th Cir.1995) (inmate challenging constitutionality of prison rule under which he was convicted, which resulted in loss of good-time credits, must file successful habeas petition as prerequisite to a § 1983 suit).
 
 
 13
 It being clear that the magistrate judge erred in not analyzing and dismissing Clarke's complaint under Heck, we must decide the effect of this given the State's failure to address it. The Sixth and Seventh Circuits, using different rationales, have held that this objection may not be waived. Dixon v. Chrans, 101 F.3d 1228, 1231 (7th Cir.1996); Hadley v. Werner, 753 F.2d 514, 516 (6th Cir.1985). We find it helpful to analogize to the law governing the waiver of the requirement that a state prisoner exhaust his state remedies before filing a § 2254 suit in federal court. Although there is a strong presumption in favor of requiring the prisoner to pursue his available state remedies, the failure to exhaust is not itself a jurisdictional bar. Granberry v. Greer, 481 U.S. 129, 131, 107 S.Ct. 1671, 1673-74, 95 L.Ed.2d 119 (1987). In Granberry, the Court stated that where a case involves "an issue on which an unresolved question of fact or of state law might have an important bearing, interests of comity and federalism may make it appropriate to insist on complete exhaustion." Id. at 134-35, 107 S.Ct. at 1675-76. Here, the magistrate judge never made any findings as to whether the prison conviction was based solely on the charge that Clarke threatened legal redress. This was the only charge of the three that she found to be based upon an unconstitutional portion of the rule. She simply concluded his rights were violated. If his prison conviction were based on his belligerence it would not be constitutionally infirm and he would not be entitled to any relief.
 
 
 14
 Where the issues in a claim are highly factual and unresolved and there is additional relevant evidence that has not been considered, the case should be dismissed and the state remedies exhausted. Graham v. Johnson, 94 F.3d 958, 970-71 (5th Cir.1996). Because that is the situation here, we vacate the magistrate judge's judgment in favor of Clarke on this claim and those parts of her order which attempt to make him whole for the alleged constitutional violation. We remand with directions to dismiss the claim without prejudice to Clarke filing again at such time as he is able to demonstrate that he has received the requisite habeas relief.[8] See Johnson v. McElveen, 101 F.3d 423, 424 (5th Cir.1996).
 
 III. Facial Challenge
 
 15
 We turn now to Clarke's facial challenge to the rule and the magistrate judge's order declaring the challenged portion of Rule 3 unconstitutional and enjoining its enforcement.
 
 A. Preliminary Inquiries
 
 16
 We must initially determine whether the principles of Heck allow us to address Clarke's claim for prospective relief. In Edwards, the Court stated that "[o]rdinarily, a prayer for prospective relief will not 'necessarily imply' the invalidity of a previous loss of good time credits and so may properly be brought under § 1983." 520 U.S. at ----, 117 S.Ct. at 1589. That is the case here. As we discuss above, it is unclear upon which portion of the defiance rule Clarke's conviction is based. That being so, a ruling in Clarke's favor on his First Amendment claim for prospective relief will not "necessarily imply" the invalidity of his prison conviction.
 
 
 17
 The Court in Edwards stated that, while Heck might not bar a suit for prospective injunctive relief, we should ensure the litigant has standing to pursue the claim and that the requirements for federal injunctive relief, as discussed in O'Shea v. Littleton, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), are met. We first look to the question of standing. The question of a litigant's standing to bring suit is jurisdictional as it implicates judicial power under Article III. Accordingly, we must examine it sua sponte if necessary. E.g., Lewis v. Casey, 518 U.S. 343, ---- n. 1, 116 S.Ct. 2174, 2178 n. 1, 135 L.Ed.2d 606 (1996). The Constitution requires that a litigant have suffered or will imminently suffer an injury, that this injury is fairly traceable to the defendant's conduct, and that a favorable decision will redress her injury. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324-25, 82 L.Ed.2d 556 (1984). The Supreme Court's decision in City of Houston v. Hill, 482 U.S. 451, 459 n. 7, 107 S.Ct. 2502, 2508 n. 7, 96 L.Ed.2d 398 (1987), among others, demonstrates that Clarke has sufficient fear of being punished by the challenged portion of the rule in the future to satisfy the injury requirement. In addition to the prison conviction which is discussed above, Clarke received several defiance convictions after his transfer to WCI, many of them pertaining to his challenges to the lawfulness of the actions of prison officials. Having thus "exhibited a continuum of behavior," Henschen v. City of Houston, 959 F.2d 584, 589 (5th Cir.1992), Clarke has suffered the requisite injury. The second and third elements are obviously met here as Clarke's injury is posed by the enforcement of portions of Rule 3, a rule which, if enjoined, will no longer pose a threat to Clarke. Clarke has standing to pursue prospective relief. Further, none of the concerns expressed by the Court in O'Shea counsel against injunctive relief here.
 
 B. First Amendment Analysis
 
 18
 The rule at issue here prohibits "threatening [a prison employee] with legal redress during a confrontation situation." It excludes from its coverage such threats made outside a "confrontation situation," the "actual composition or filing of a writ, suit, etc.," and threats to write the Secretary of the Department of Corrections, the warden, or other prison officials. Such a rule, if enacted to govern the relations of free citizens with police officers, would clearly be unconstitutional. The Supreme Court has held that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." City of Houston, 482 U.S. at 461, 107 S.Ct. at 2509 (city ordinance making it unlawful to interrupt police officer in performance of his duties unconstitutionally overbroad). See also Norwell v. City of Cincinnati, 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed.2d 170 (1973) (per curiam) (reversing conviction for disorderly conduct where defendant was "loud and boisterous," stating that a person "is not to be punished for non-provocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"); Guffey v. Wyatt, 18 F.3d 869, 871-73 (10th Cir.1994) (police officer unconstitutionally arrested referee who told officer to get off court during high school basketball game); Enlow v. Tishomingo County, 962 F.2d 501, 509 (5th Cir.1992) (officers unconstitutionally arrested individual who queried officers about legality of their gambling raid); Buffkins v. City of Omaha, 922 F.2d 465, 472 (8th Cir.1990) (calling arresting officer an "asshole" was protected speech), cert. denied, 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991); Duran v. City of Douglas, 904 F.2d 1372, 1378 (9th Cir.1990) (profanities and obscene gestures directed at police officer constituted protected speech); City of New Orleans v. Lewis, 263 La. 809, 269 So.2d 450, 460 (1972) (Tate, J., dissenting) ("The right to criticize our public officers, be they judges or policemen, has, since our earliest days, been deemed a basic right of all Americans"), rev'd, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974).
 
 
 19
 The question we face is whether and to what extent this result changes when the citizen is incarcerated. To answer this, we turn to the teachings of the Supreme Court with respect to the constitutional rights of prisoners. The Court has stated that while "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), they do not enjoy all protections either. A prisoner retains only those rights that are not inconsistent with his status as a prisoner or with the legitimate penological goals of the corrections system. Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 125, 97 S.Ct. 2532, 2537-38, 53 L.Ed.2d 629 (1977). This is as true of the right to free speech as it is of any other constitutional right. Id. The Court has recognized that the management of a prison is no small task and, accordingly, has repeatedly emphasized that great deference is due the determinations of prison administrators. Courts must be sensitive to their expert judgment and mindful that the judiciary is " 'ill equipped' to deal with the difficult and delicate problems of prison management." Thornburgh v. Abbott, 490 U.S. 401, 407-08, 109 S.Ct. 1874, 1878-79, 104 L.Ed.2d 459 (1989). At the same time, our deference "must be schooled, not absolute." Campbell v. Miller, 787 F.2d 217, 227 n. 17 (7th Cir.), cert. denied, 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). The fact that initial responsibility for the prison is vested in prison administrators "does not mean that constitutional rights are not to be scrupulously observed." Bell, 441 U.S. at 562, 99 S.Ct. at 1886.
 
 
 20
 In analyzing a First Amendment challenge to a prison regulation we use the standard described by the Court in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court held that so long as a restriction on a prisoner's constitutional right is "reasonably related" to a "legitimate penological interest," there is no constitutional violation. Id. at 89, 107 S.Ct. at 2261-62. The Court set forth four factors that are relevant in determining whether this standard has been met. While the framework of analysis is deferential to the government, the Court has emphasized that it is not "toothless." Thornburgh, 490 U.S. at 414, 109 S.Ct. at 1882.
 
 
 21
 The first factor is multi-faceted. We must determine whether the governmental objective is legitimate and neutral and whether the regulation is rationally related to that objective. We begin with determining whether the State's proffered penological interest is "legitimate." The State proffers the goal of institutional security. The stated purpose of the rule is "to prevent the escalation of tension that can arise from ... exchanges between inmates and guards." There can be no question but that this is a legitimate interest. See, e.g., Hewitt v. Helms, 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983) ("[t]he safety of the institution's guards and inmates is perhaps the fundamental responsibility of the prison administration"); Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804-05 (1974) (security is "central to all other corrections goals"). Next we must determine whether the regulation is "content neutral." The Supreme Court has stated that content-based speech restrictions are "neutral" so long as distinctions are drawn "solely on the basis of their potential implications for prison security." Thornburgh, 490 U.S. at 415-16, 109 S.Ct. at 1882-83. Thus, while the government here is proscribing the content of the speech of Louisiana prisoners, this is "neutral" for purposes of our analysis. See also Giano v. Senkowski, 54 F.3d 1050, 1055 (2d Cir.1995) (discussing neutrality under Turner ).
 
 
 22
 We finally examine whether there is a rational relationship between the regulation and the proffered interest. This is essentially the same test we use in analyzing governmental classifications in economic matters, see, e.g., City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1975), and is very deferential. Despite the fact that the State simply relies on a conclusory assertion that there is a relationship, leaving us to discern it, we are able to come up with two theories. First, the State intimated at argument that to permit inmates to verbally challenge the legality of an official's actions would lead to growing disrespect for the officials and, eventually, the breakdown of authority. We do not buy this peculiar notion that an inmate's stated intention to abide by the rules of the prison and make use of available access to the external and internal legal systems is a threat to the very order and security of the prison. If anything, we think the opposite is true. Second, it has also been suggested that permitting inmates to make these challenges to prison officials is likely to result in confrontations. It is supposed that the words "I'm going to sue" equate to "fighting words," geared to anger and provoke prison staff. We are hesitant to deny the existence of some connection owing to our deference to prison administrators and, therefore, conclude that a relationship, albeit tenuous, exists here.
 
 
 23
 It is not enough, however, that the restriction is related to a governmental interest: it must be "reasonably related," the reasonableness determined by consideration of the remaining factors. We consider next whether there are alternative means of exercising the right that remain open to inmates with the present rule in place. There are not. The exception the rule makes for submitting written complaints to a superior does not in any way equate to the ability to tell an official, before she acts, that the inmate believes her action is illegal. Rather than serve as a means of dispute prevention, the existing rule permits only those activities that mop up after an incident has occurred. As stated by the Sixth Circuit, the fact that the State leaves open the possibility of "filing traditional lawsuits" does not satisfy this factor; the inquiry, rather, should be whether the rule leaves an inmate with an alternate means of communicating his grievance to his chosen recipient. Muhammad v. Pitcher, 35 F.3d 1081, 1085 (6th Cir.1994). The State asserts that this requirement is met because the rule permits inmates to communicate their threat to a guard when the two are not in a "confrontation situation." It is unclear how this is an alternative. At argument, the State explained that a "confrontation situation" exists whenever a prison official and an inmate have a disagreement. Obviously, then, there is no such creature as a "nonconfrontation situation." We agree with the magistrate judge that this distinction between "confrontation" and "non-confrontation" situations is illusory.
 
 
 24
 We must also consider whether heightened deference is due the prison administrators because accommodation of the claimed right would have an adverse impact on the prison. We do not believe any adverse impact is likely. Although we granted the State the benefit of the doubt that there might be a relationship between the rule and the State's interest in preserving order in its prisons, we note now that, as stated above, any such relationship is tenuous at best. The Supreme Court has recognized that, as an objective matter, law enforcement officers, because of their training, are to be expected to exercise great self-restraint when their authority is challenged. See City of Houston, 482 U.S. at 462, 107 S.Ct. at 2509-10; Lewis v. City of New Orleans, 415 U.S. 130, 135, 94 S.Ct. 970, 973, 39 L.Ed.2d 214 (Powell, J. concurring in result) ("a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting words") (citations omitted). Inmates in America's prisons, like their fellow citizens on the outside, are fond of litigation. Indeed, as a colleague on the Second Circuit has recognized, the fastest growing category of civil litigation in the federal courts is prisoner lawsuits. Jon O. Newman, Pro Se Prisoner Litigation: Looking for Needles in Haystacks, 62 Brook. L.Rev. 519, 519 (1996). Concern about this fact recently prompted the Congress to enact legislation geared to curtail the proliferation of such suits. See Prison Litigation Reform Act of 1995, Pub.L. No. 104-134, 110 Stat. 1321 (1996). Thus, prison officials may well be annoyed by prisoners' threats to sue them for one supposed injustice or another and may tire of hearing the incantations of Supreme Court case law. Annoyance, however, is insufficient to justify the suppression of this speech.
 
 
 25
 Further, the State is still able to punish inmates for the manner in which they convey their message, whether it be "I'm going to sue" or "the Constitution forbids your actions." As an incident of their incarceration, prisoners lack the same freedom to criticize they would enjoy on the outside, a point we acknowledged in Gibbs v. King, 779 F.2d 1040 (5th Cir.), cert. denied, 476 U.S. 1117, 106 S.Ct. 1975, 90 L.Ed.2d 659 (1986). In that case we upheld a Louisiana "disrespect" rule against a facial challenge. At that time, Rule 7 forbade, inter alia, cursing or insulting an employee, making derogatory comments, or using "intrusive verbal behavior." The current Rule 7 prohibits "disrespectful" conversation and other portions of Rule 3 prohibit threats of violence, intimidation, or resistance. These provisions may be employed to punish those inmates whose message contains as much conduct as it does speech. The State must ensure, however, that these other portions of the prison rules are not used as a backdoor means of punishing inmates for exercising their right to criticize the legality of officials' actions. Any attempt to use the rules in this manner would result in an unconstitutional application of the rules.
 
 
 26
 We conclude that the challenged portion of Rule 3 does not have the "reasonable relationship" to the goal of prison order and security that the Constitution requires. Our conclusion is consistent with statements expressed in prior decisions of our court. See, e.g., Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir.1995), cert. denied, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996); Gibbs, 779 F.2d at 1046 (a guard "may not harass an inmate in retaliation for the inmate complaining to supervisors about the guard's conduct") Ruiz v. Estelle, 679 F.2d 1115, 1154 (5th Cir.) (holding that prison officials were prohibited from "retaliati[ng] against inmates who complain of prison conditions or official misconduct"), opinion amended in part and vacated in part, 688 F.2d 266 (5th Cir.1982), cert. denied, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). We affirm the magistrate judge's holding on this claim.
 
 IV. Retaliation Claim
 
 27
 Clarke alleges he was retaliated against for having taken legal action against the Department of Corrections while incarcerated at WCI. Specifically, Clarke states he received ten write-ups in a two-month period after his lawyer successfully petitioned for an injunction ordering the prison to conduct a re-test of a positive drug test and after a dispute involving a phone call Clarke made to his lawyer that was terminated by prison authorities. In addition to the disciplinary charges, Clarke alleges that Sergeant Doug Goss physically and verbally assaulted him in his cell and read his legal mail. He also contends that Sergeants Steve Miller and Doug Miller verbally and sexually harassed him by forcing him to expose his genitalia to them and writing him up when he initially refused their demands. He argues that the guards utilized "irregular procedures" in terms of the number, frequency, and results of the write-ups and he introduced evidence to support these contentions, including that he had received only seven write-ups in the previous three years. He was given disciplinary hearings on these charged infractions, was found guilty of all of them, and was punished with the loss of good-time credits, time in isolation, and ultimately with transfer to the state penitentiary at Angola because of his "poor conduct."
 
 
 28
 It is well established that prisoners enjoy a constitutional right to access the courts. E.g., Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). It is equally well established that prison officials may not retaliate against a prisoner for exercising this right. Woods, 60 F.3d at 1164; Gibbs, 779 F.2d at 1046; Campbell v. Beto, 460 F.2d 765, 768 (5th Cir.1972). The elements of a retaliation claim are the "invocation of a 'specific constitutional right,' the defendants' intent to retaliate against the plaintiff for his or her exercise of that right, a retaliatory adverse act, and causation, i.e., 'but for the retaliatory motive the complained of incident ... would not have occurred.' " Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir.1997) (quoting Woods, 60 F.3d at 1166). With respect to the last element, we emphasized in Woods that "[a]n action motivated by retaliation for the exercise of a constitutionally protected right is actionable even if the act, when taken for a different reason, may have been legitimate." 60 F.3d at 1165.
 
 
 29
 We hold that the magistrate judge's determination that prison officials did not retaliate against Clarke should stand. She based her determination on her finding that the guards were unaware of the incidents with the drug test and the shortened phone call. She made this finding after hearing the testimony of Clarke, Warden Day, and the guards at trial. Although Warden Day admitted on cross-examination that many people at the prison were aware of the incidents and Clarke testified to the guards' retaliatory intent, the guards themselves testified they had no knowledge of them. Based on her observation of the witnesses' demeanor, she found the guards credible. Because the guards were unaware of these incidents, she concluded, they could not have acted with a retaliatory animus.
 
 
 30
 The Federal Rules of Civil Procedure direct us to defer to a trial court's finding of fact unless we determine it to be "clearly erroneous." Fed.R.Civ.P. 52(a). The resolution of a dispute such as this one--Witness A says "X" and Witness B says "Y"--is perhaps the textbook example of a finding of fact. Clarke asserts, however, that our review of this finding should be de novo, that we should conduct our own review of the record and feel free to disregard the magistrate judge's factual conclusions. For support he relies upon the Supreme Court's decision in Bose Corp. v. Consumers Union, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), in which the Court held that, Rule 52(a) notwithstanding, an appeals court must exercise de novo review of a trial court's determination that a defamation defendant acted with "actual malice" in reporting false information about a public figure, thereby taking it outside the protection of the First Amendment.
 
 
 31
 Although the outer boundaries of the Bose ruling are unclear, see 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review § 2.19 (2d ed.1992), Clarke boldly asserts that Bose applies to all First Amendment claims and cites to our decision in Mills v. Damson Oil Corp., 931 F.2d 346 (5th Cir.1991), for support. Mills does not help him. We held in Mills only that Bose did not apply to alter the standard by which we reviewed the trial court's findings of fact in a commercial mineral dispute governed by Mississippi law. We stated that Bose "involves first amendment litigation in which the appellate court has an obligation to make an independent examination of the entire record." Id. at 351. This language does not imply that Bose applies to all First Amendment cases but only that Bose itself was a First Amendment case.
 
 
 32
 Regardless, we need not decide here how far Bose extends outside of the defamation arena because, even if it applies to retaliation claims, it would not change the standard of review in this case. The de novo review prescribed by Bose is limited, in the defamation context, to the question of whether a defendant acted with actual malice. Bose, 466 U.S. at 514, 104 S.Ct. at 1967. The only element of a retaliation claim that resembles a finding of "actual malice" is that requiring the defendant to have acted with retaliatory intent. Assuming Bose extends to our review of this claim, there is no reason to believe it would apply more broadly here than it does in the context of a defamation claim. We have held that Bose review does not extend to preliminary fact findings and credibility determinations made by the trier of fact. Peter Scalamandre & Sons, Inc. v. Kaufman, 113 F.3d 556, 560 (5th Cir.1997); Brown v. Petrolite Corp., 965 F.2d 38, 46 (5th Cir.1992). Because the magistrate judge's finding on the element of intent was premised upon a preliminary finding of no knowledge of Clarke's legal activities--itself based upon an evaluation of witness credibility--Bose would not mandate de novo review. Accordingly, we review for clear error.
 
 
 33
 A finding is clearly erroneous when, although there is evidence to support it, our review of the evidence leaves us with the "definite and firm conviction that a mistake was committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948). In a bench trial, the assessment of witness credibility is a task assigned to the trial judge, who is able, unlike reviewing appellate judges, to see and hear witnesses as they testify. Accordingly, we are "especially reluctant to set aside findings that are based upon a trial judge's determination of the credibility of witnesses giving different accounts." Ruiz, 679 F.2d at 1131; United States v. Wiring, Inc., 646 F.2d 1037, 1041 (5th Cir. Unit B 1981) ("appellate courts should be loathe to set aside such determinations"). With this in mind, we turn to Clarke's argument as to why the magistrate judge erred. He states that the chronology of events in this case mandates a finding that the defendants retaliated against him. We held in Jackson v. Cain, 864 F.2d 1235, 1248 (5th Cir.1989), that a prisoner made out a legally sufficient claim of retaliation based upon a "chronology of events" that suggested retaliation had occurred. Summary judgment was therefore inappropriate because a fact issue existed as to retaliatory intent. Here, by contrast, the fact issue has been resolved. Although the events are suspicious, we have no real basis for disturbing the magistrate judge's finding on this issue.
 
 V. Conclusion
 
 34
 We have determined that Clarke's challenge to his disciplinary conviction, to the extent it seeks to recover lost good-time credits, is barred by Preiser. To the extent he seeks damages, his claim is barred by Heck. Accordingly, we vacate the magistrate judge's entry of judgment in favor of him on this claim and we remand with instructions to dismiss the claim without prejudice to his filing again should he obtain the requisite habeas relief. We express no opinion on the merits of any habeas claim he might pursue. With respect to Clarke's claim for prospective relief from enforcement of the challenged portions of Rule 3, we affirm the magistrate judge's determination that the rule is unconstitutional on its face. We likewise affirm the magistrate judge's determination that prison officials did not retaliate against Clarke for his having sought protection from the courts.
 
 
 35
 AFFIRMED in part and VACATED and REMANDED in part with instructions.
 
 EMILIO M. GARZA, Circuit Judge, dissenting:
 
 36
 Because I disagree that Clarke's facial challenge to Rule 3 is cognizable under § 1983 and because, even if it is, I disagree with the majority's conclusion that Rule 3 is facially unconstitutional, I dissent from Part III of the majority opinion.
 
 
 37
 The majority concludes that Clarke's claim for prospective relief does not necessarily imply the invalidity of his previous loss of good time credits, and therefore may properly be brought under § 1983, because "it is unclear upon which portion of the defiance rule Clarke's conviction is based." However, the majority states that Clarke was punished with the loss of ten days of good time credits and was transferred to WCI because "he 'admit[ted] he threatened legal redress during confrontation with staff.' " The majority also states that Clarke alleged "that he had been punished for violating the 'no threats of legal redress' portion of Rule 3 in violation of his First Amendment rights." In addition, after describing the behavior for which Clarke was punished as his telling Captain Moulard that "he was going to file a lawsuit and an ARP" against Captain Moulard, the magistrate states in her order:
 
 
 38
 At issue in this case is that portion of Rule 3 which allows prison officials to discipline inmates for "threatening" legal redress during a "confrontation situation." Plaintiff alleges that the Rule is unconstitutional on its face or was at least unconstitutionally applied to him in violation of his First Amendment rights. From the evidence that was presented at trial, the Court readily infers that plaintiff was stripped of good time credits and was transferred to a medium security prison in retaliation for voicing his intention to exercise his First Amendment rights.
 
 
 39
 Nothing in this language indicates that the magistrate determined that Clarke had been punished for anything other than violating Rule 3's legal redress provision. Moreover, the magistrate states later in the order: "Had [Clarke] threatened the defendant with physical harm or insulted the employee or his family, disciplinary action against [Clarke] would have been appropriate under the other, unchallenged portions of DOC Rule 3." (emphasis added). The clear implication of this statement is that Clarke was not disciplined for violation of "the other, unchallenged portions" of Rule 3. Under these circumstances, a conclusion that the "legal redress" provision in Rule 3 is unconstitutional would necessarily call into question the validity of the deprivation of Clarke's good time credits. As such, Clarke would be unable to bring this suit pursuant to § 1983 and our analysis would end there. See Johnson v. Pfeiffer, 821 F.2d 1120, 1123 (5th Cir.1987) ("[E]ven broad-based challenges to the rules and procedures used by parole boards or disciplinary officials to make decisions that may affect prisoners' dates of release must be pursued in habeas corpus if resolution of the factual and legal allegations necessary to resolve the § 1983 claims would automatically entitle one or more plaintiffs to accelerated release."); Serio v. Members of La. State Bd. of Pardons, 821 F.2d 1112, 1119 (5th Cir.1987) ("Even in some broad-based attacks, resolution of the factual allegations and legal issues necessary to decide the § 1983 claim may, in effect, automatically entitle one more claimants to immediate or earlier release.... Such claims must also be pursued initially through habeas corpus.").[1]
 
 
 40
 However, in the event that Clarke can maintain his facial challenge to Rule 3 under § 1983, I also disagree with the majority's conclusion that Rule 3 is facially unconstitutional. First, I disagree with the majority's conclusion that no alternate means of exercising "the right" is available, and am troubled by the majority's apparent definition of the relevant "right" as "the ability to tell an official, before she acts, that the inmate believes her action is illegal" and the "right to criticize the legality of [prison] officials' actions." The challenged portion of Rule 3 does not prohibit such statements; rather, it prohibits an inmate from "threaten[ing] an employee in any manner, including threatening with legal redress during a confrontation situation...." Thus, the relevant right appears to be the right to threaten an employee with legal redress in a confrontation situation.
 
 
 41
 Moreover, even if this "right" is one that inmates are entitled to exercise, alternative means exist for that exercise. Rule 3 specifically states that "threatening to write to the Secretary, the Warden or other institutional officers is not a violation" of the rule. Thus, even during a confrontation, an inmate can communicate his grievance to his chosen recipient by threatening to report the employee to the Secretary, the Warden or another institutional officer. See Muhammad v. Pitcher, 35 F.3d 1081, 1085 (6th Cir.1994) (stating that relevant inquiry is whether rule leaves inmate with alternate means of communicating grievance to chosen recipient). In addition, an inmate can presumably communicate his grievance to his chosen recipient in the form of an administrative complaint.
 
 
 42
 I also disagree with the majority's conclusion that no adverse impact will result from accommodation of the "right" to threaten prison employees with legal redress in confrontation situations. I view the relationship between Rule 3's prohibition on threats of legal redress during confrontations and the State's asserted interest in preserving order in its prisons as quite legitimate. Permitting inmates to threaten employees with legal redress in confrontation situations can only contribute to the tension undoubtedly present in such situations; escalating tension can lead to violence. Minimizing the occurrence of such escalation by prohibiting threats of legal redress in heated situations is a legitimate security measure. See Pell v. Procunier, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) ("[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves."). The authority the majority cites as support for its conclusion that the relationship between Rule 3 and the State's interest in preserving order in its prisons is "tenuous at best" pertains to police officers, not to prison guards.
 
 
 43
 Furthermore, the authority the majority cites in support of its conclusion that "the challenged portion of Rule 3 does not have the 'reasonable relationship' to the goal of prison order and security that the Constitution requires" does not address analogous factual situations. To the contrary, the cited cases are retaliation cases and as such are irrelevant to our analysis of the facial validity of Rule 3. In sum, I would conclude that Rule 3 is valid because it is reasonably related to legitimate penological interests. See Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (holding that prison regulation that impinges on inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests").
 
 
 
 [1]
 At trial, both Clarke and Moulard testified to their differing recollections of the incident. Moulard reiterated the statements contained in his report, discussed infra, and described the incident as volatile. Clarke testified that the situation was not overly contentious but that Moulard was angry. The magistrate judge found Clarke to be more credible as to this aspect of his testimony and resolved the factual dispute in his favor. Accordingly, we use her fact findings here
 
 
 [2]
 The rule was amended in 1993 but the prohibition against threatening legal redress in a "confrontation situation" has not changed in any way and remains part of the defiance rule
 
 
 [3]
 This second test came back negative for the presence of drugs
 
 
 [4]
 It is unclear on what legal basis she made this determination. Even if a successful plaintiff in a § 1983 action cannot prove actual injury, he is nevertheless entitled to nominal damages. Carey v. Piphus, 435 U.S. 247, 266-67, 98 S.Ct. 1042, 1053-54, 55 L.Ed.2d 252 (1978); Familias Unidas v. Briscoe, 619 F.2d 391, 402 (5th Cir.1980) (holding that Carey rule applies to First Amendment claims). Another possible explanation is that she was, in a roundabout way, granting a defense motion for qualified immunity. This motion, however, was only filed after the conclusion of the trial. The defense of qualified immunity is an affirmative defense, Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923-24, 64 L.Ed.2d 572 (1980), and must be pleaded like any other such defense. See Fed.R.Civ.P. 8(c). The failure to properly raise the defense results in its waiver. E.g., Cronen v. Texas Dept. of Human Servs., 977 F.2d 934, 939 (5th Cir.1992); United States v. Burzynski Cancer Research Institute, 819 F.2d 1301, 1307 (5th Cir.1987), cert. denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 990 (1988). There is certainly a question here as to whether the defense was properly raised. We need not resolve this mystery, however, for the reasons discussed in part II. of this opinion
 
 
 [5]
 Clarke has not appealed the magistrate judge's denial of his claims under Louisiana law
 
 
 [6]
 On April 17, 1996, the magistrate judge stayed her order enjoining enforcement of this portion of the rule pending our decision in this case
 
 
 [7]
 It should be noted that the magistrate judge apparently conflated two constitutional theories in her analysis of this claim, confusing an "application challenge" with a retaliation claim. She stated in her "Order and Reasons" that the evidence adduced at trial led her to conclude that Clarke "was stripped of good-time credits and transferred to a medium security prison in retaliation for voicing his intention to exercise his First Amendment rights. The application of Rule 3 to Clarke for the August 16, 1992 incident was unconstitutional." Where the focus of a cause of action is on the ultimate merit of an underlying disciplinary proceeding, the claim is not one of retaliation but of illegal application. See Woods v. Smith, 60 F.3d 1161, 1164-65 (5th Cir.1995), cert. denied, 516 U.S. 1084, 116 S.Ct. 800, 133 L.Ed.2d 747 (1996); see also Sheldon v. Hundley, 83 F.3d 231, 234 (8th Cir.1996). Clarke is challenging the validity of his prison conviction by asserting that it is premised on an unconstitutional rule. This is not a claim of "retaliation."
 
 
 [8]
 Monetary relief in a subsequent § 1983 suit might be difficult, however. As part of the Prison Litigation Reform Act, Congress changed the law to prevent the filing of a suit by a prisoner for mental or emotional injury suffered while in custody without "a prior showing of physical injury." 42 U.S.C. § 1997e(e). See also Siglar v. Hightower, 112 F.3d 191, 193-94 (5th Cir.1997) (discussing this requirement)
 
 
 [1]
 To evaluate whether resolution of a broad-based claim would automatically entitle a claimant to immediate or earlier release, "a district court must consider the distinction between claims that would merely enhance eligibility for accelerated release and those that would create entitlement to such relief." Serio, 821 F.2d at 1119. My discussion is premised upon an assumption that Clarke seeks restoration of good time credits that affect his entitlement to early release rather than merely his eligibility for parole consideration. The majority does not address this important distinction