960 F.2d 1425
 Rogaciano Gonzales MENDOZA, Plaintiff-Appellant,
v.
James BLODGETT; Lt. Gary Edwards; Edith Jones; Ron Van
Boening; Jack Lambert; Lawrence Kincheloe,
Defendants-Appellees.
Rogaciano Gonzales MENDOZA, Plaintiff-Appellee,
v.
James BLODGETT; Lt. Gary Edwards; Edith Jones; Ron Van
Boening; Jack Lambert; Lawrence Kincheloe,
Defendants-Appellants.
 Nos. 91-35303, 91-35305.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 4, 1992.
Decided April 1, 1992.
As Amended April 28, 1992.
 
 E. Christina Beusch, Asst. Atty. Gen., Olympia, Wash., for defendants-appellees-appellants.
 Kristin Bjorkman and Thomas G. Myrum, Legal Interns, supervised by Maureen Laflin, University of Idaho Law School, Moscow, Idaho, for plaintiff-appellant-appellee.
 Before: HUG, NOONAN, and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 OVERVIEW
 
 1
 Rogaciano Gonzales Mendoza, an inmate at the Washington State Penitentiary at Walla Walla ("the prison") filed a civil rights action pursuant to 42 U.S.C. § 1983. Mendoza alleged that the defendants, administrators and correctional officers at the prison, deprived him of procedural due process under the fourteenth amendment in the implementation of the prison's "dry cell" policy[1] and the prison's and state's visitation policy. The district court[2] granted summary judgment for the defendants. Mendoza appeals the district court's determination that the defendants are entitled to qualified immunity;[3] the defendants cross-appeal the district court's determination that Mendoza had a protected liberty interest under the prison's dry cell policy and under visitation regulations promulgated by the prison and the state.
 
 
 2
 We have jurisdiction under 28 U.S.C. § 1291 and we affirm. We hold that Mendoza had a state-created liberty interest under the prison's dry cell policy which gave him a right to procedural due process. The defendants violated this right, but they are entitled to qualified immunity.
 
 
 3
 We also hold that Mendoza had a state-created liberty interest which entitled him to procedural due process under the prison's and the state's visitation regulations; the defendants did not violate this right.
 
 FACTS AND PROCEDURE
 
 4
 On September 29, 1989, Mendoza was visited by his wife ("Mrs. Mendoza") and six children in the visiting room of the prison. Correctional officers monitored the visit. Mendoza's children requested use of the restroom. A correctional officer unlocked the door and prepared to lead the children to the restroom. She noticed on the floor a balloon covered with a white slimy substance and the tip bitten off. No other prisoners or visitors had been in the area.
 
 
 5
 The officer informed her supervisor, who in turn contacted Associate Superintendent Lambert. According to the defendants, Lambert knew from his years of experience that balloons commonly were used to smuggle drugs into the institution. Lambert claimed he had a reasonable belief that Mendoza had ingested a balloon or balloons filled with narcotics.
 
 
 6
 Mendoza was charged with an infraction of prison rules and placed on a dry cell watch. Under this procedure, an inmate is placed in a custody-locked cell for the purpose of maintaining and inspecting at least three consecutive normal bowel movements for contraband. According to the dry cell procedure in place at the time of the incident, "[f]eces watches are implemented to recover contraband believed, with reasonable suspicion, to be carried internally by an inmate." Former Institutional Order (I.O.) 09.053.[4] "Feces Watch searches shall normally be concluded within 84 hours or after the equivalent of three normal bowel movements, whichever occurs first." Id.
 
 
 7
 Mendoza's dry cell watch began at 8:40 p.m. on September 29, 1989. He was placed in a hospital cell, strip-searched and given a clean pair of shorts. He slept on a mattress on the floor without a blanket, conforming with the dry cell watch requirement that the hands of a prisoner be visible at all times. Mendoza was held in the cell for 24 hours. During that time he was fed three meals and he defecated five times. The prison authorities found no contraband.
 
 
 8
 Mendoza was released from the watch at 8:41 p.m. on September 30, 1989. Within five days thereafter, a hearing was held on the infraction charge. Mendoza was found guilty of attempting to smuggle illegal contraband into the institution. However, on November 3, Superintendent Blodgett conducted his own investigation and determined that although the corrections officers had reasonable suspicion to place Mendoza on the dry cell watch, there was insufficient evidence of Mendoza's direct involvement in smuggling, and the infraction was dismissed.
 
 
 9
 Notwithstanding the dismissal of the infraction charge, Mendoza's visitation privileges with his wife and children were suspended for 90 days. In a letter to Mrs. Mendoza, Blodgett stated that "[d]ue to your history of attempting to introduce contraband into this institution by way of your children, I have no recourse but to believe this was again your intention."
 
 
 10
 The district court granted summary judgment, dismissing Mendoza's civil rights action in which he sought to vindicate his asserted rights to procedural due process under the dry cell policy and under the visitation regulations. This appeal followed.
 
 DISCUSSION
 A. Standard of Review
 
 11
 We review a district court's grant of summary judgment de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
 
 
 12
 B. Liberty Interest Created by the Dry Cell Watch Procedure
 
 1. State-Created Liberty Interests
 
 13
 The fourteenth amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law...." U.S. Const. amend XIV, § 1. Mendoza argues that he possesses a liberty interest, requiring prison officials to follow the procedures outlined in the former dry cell watch regulation, as well as those set forth in Washington Administrative Code sections involving administrative segregation.
 
 
 14
 A liberty interest may arise from either of two sources: the due process clause or state law. Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); Toussiant v. McCarthy, 801 F.2d 1080, 1089 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). Mendoza does not argue that the due process clause itself provides him the liberty interest he contends was abridged. Rather, he argues the Washington Administrative Code and the former dry cell watch regulation created that liberty interest.
 
 
 15
 A state creates a protected liberty interest when it places substantive limitations on official discretion. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 462, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989). The most common way a state creates such an interest is by adopting regulations which establish "substantive predicates" to govern official decisionmaking and by mandating the outcome to be reached upon a finding that the relevant criteria have been met. Id. There must be particularized standards or criteria to guide the state's decisionmakers, and the criteria must serve to limit discretion. Id. If a decisionmaker can make his decision for any constitutionally permissible reason or for no reason at all, the state has not created a liberty interest. Olim v. Wakinekona, 61 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983).
 
 
 16
 The regulations also must contain " 'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." Kentucky Dep't of Corrections, 490 U.S. at 463, 109 S.Ct. at 1910 (citing Hewitt, 459 U.S. at 471-72, 103 S.Ct. at 871-72). Although a search for mandatory language necessarily focuses on words such as "shall" and "will," mere use of these words is insufficient. Toussiant, 801 F.2d at 1098. Rather, the search is for "relevant mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether an inmate may be deprived of the particular interest in question." Kentucky Dep't of Corrections, 490 U.S. at 464 n. 4, 109 S.Ct. at 1910 n. 4 (emphasis in original).
 
 2. Former Dry Cell Watch Procedure
 
 17
 The prison's former dry cell watch regulation creates a liberty interest. It provides particularized standards and criteria. A prisoner can "be placed upon Feces Watch only upon determination that there is reasonable suspicion that [he] is currently secreting contraband." Former I.O. 09.053 (emphasis added). Reasonable suspicion
 
 
 18
 [s]hall be individualized suspicion which is based upon specific objective facts in conjunction with rational inferences which Correctional Staff would be entitled to make based upon their judgment and experience and which reasonably warrants suspicion that an inmate is secreting contraband. Individualized suspicion shall be specifically directed to the person who is the target of the search, which will be documented.
 
 
 19
 Id.
 
 
 20
 The duration of the watch is also subject to particularized criteria. "Feces Watch searches shall normally be concluded within 84 hours or after the equivalent of three normal bowel movements, whichever occurs first." Id. The regulation allows 24-hour extensions by the superintendent or his designee "where the inmate has not had the equivalent of three normal bowel movements within the 84-hour period," in cases where "there is specific and reliable information" the subject of the search is "secreting contraband on his person by means of a method which would prevent it from being passed after three normal bowel movements, or the equivalent thereof," or "in the event of no bowel movements or re-ingesting the contraband." Id.
 
 
 21
 The regulation contains "explicitly mandatory language." See Hewitt, 459 U.S. at 472, 103 S.Ct. at 871. The decisionmaker must decide whether to place a prisoner on a dry cell watch by determining if reasonable suspicion exists. Further, the decisionmaker may extend the duration of the watch only under the conditions outlined in the regulation.
 
 
 22
 The defendants mistakenly focus upon the question whether the superintendent has discretion not to place a prisoner on a dry cell watch even though he may have reasonable suspicion that the prisoner has secreted contraband. The relevant question is whether the superintendent has discretion to fail to follow dry cell watch procedures once he determines to place a prisoner on a watch. The substantive predicates and explicitly mandatory language indicate he has no such discretion. The regulation creates a protected liberty interest.
 
 3. Administrative Segregation Regulations
 
 23
 Mendoza also argues that the Washington state administrative regulations governing the placement of prisoners in administrative detention, Washington Administrative Code ch. 137-32, create a liberty interest. We need not reach this issue, because these regulations are inapplicable to the dry cell watch procedure at issue here.
 
 
 24
 The Washington state administrative segregation regulations are aimed at long-term segregation when the presence of the inmate in the general population poses a serious threat to the inmate or others or the orderly operation of the institution. See Wash.Admin.Code § 137-32-005. They are not aimed at confiscating contraband. We agree with the district court that "the State of Washington did not intend [these] administrative segregation provisions to apply to the dry cell watch. Indeed, it would be unreasonable to require all of [such] procedures in the relatively short span of a dry cell watch."
 
 
 25
 C. What Process is Due?
 
 
 26
 The Supreme Court in Hewitt described the very limited procedural protections afforded prisoners.
 
 
 27
 The requirements imposed by the [due process] Clause are, of course, flexible and variable dependent upon the particular situation being examined. In determining what is "due process" in the prison context, we are reminded that "one cannot automatically apply procedural rules designed for free citizens in an open society ... to the very different situation presented by a disciplinary proceeding in a state prison." "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."
 
 
 28
 Hewitt, 459 U.S. at 472, 103 S.Ct. at 871 (citations omitted).
 
 
 29
 Hewitt concerned the placement of an inmate in administrative segregation. The Court held that an informal, nonadversary evidentiary review is sufficient "both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him." Id. at 476, 103 S.Ct. at 874. An inmate has the right to notice and the right to be heard. An informal proceeding "must occur within a reasonable time" following the inmate's placement in administrative segregation, taking into account "the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials." Id. at 476 n. 8, 103 S.Ct. at 874 n. 8. In Hewitt, prison officials satisfied due process through a hearing "[o]nly five days" after the inmate's transfer to administrative segregation. Id. at 477, 103 S.Ct. at 874.
 
 
 30
 Having determined that the state has created a liberty interest by its dry cell watch regulation, we must decide whether the process afforded Mendoza satisfied the minimum requirements of procedural due process under the fourteenth amendment. To determine this question, we consider Mendoza's private interests, the governmental interests, and the value of the procedural requirements. Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
 
 
 31
 Mendoza's private interests were substantially affected by the dry cell watch. The watch procedures in effect at the time were extremely unpleasant. Pursuant to those procedures, Mendoza was permitted to wear only shorts. He was confined in the cell on a mattress on the floor without a blanket.[5] He was not permitted to shower, although he was provided a wash cloth, a face towel, a bar of soap, toothbrush and tooth powder, and a wash basin at specified times. He was subjected to a continuous watch by a prison guard. He had to keep his hands in sight at all times, and his feces and urine were meticulously examined.
 
 
 32
 The prison officials' interests were triggered by Mendoza's suspected involvement in smuggling contraband into the prison. Prompt action was required. Illicit drugs smuggled into a prison create discipline problems, lead to further crime, and increase health dangers to inmates. The officials' response to this threat by implementing the dry cell watch policy was justified. Mendoza does not dispute this. Rather, he challenges the constitutionality of the procedures afforded a prisoner placed on the dry cell watch. We turn now to a consideration of this question.
 
 
 33
 Mendoza received a hearing within five days after the end of his placement on the watch. By this time, however, Mendoza had suffered all the indignities the watch demands.
 
 
 34
 Such an after-the-watch hearing in this context is insufficient to accord the prisoner due process. The prisoner is entitled to notice of the reason for being placed on the watch, and an opportunity to respond in writing, within a reasonable time after the commencement of the watch. No formal hearing is required, but the prisoner's response must be given some consideration. The failure to provide this minimum level of due process violates the procedural due process rights of an inmate placed on the dry cell watch. Accordingly, we hold Mendoza's rights to procedural due process were violated.[6]
 
 D. Qualified Immunity
 
 35
 As a general rule, an official is entitled to qualified immunity if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The court must "identify the applicable law and determine whether that law was 'clearly established' at the time the defendants acted." Alexander v. Perrill, 916 F.2d 1392, 1396 (9th Cir.1990). In Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Supreme Court explained that the
 
 
 36
 contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 37
 Id. at 640, 107 S.Ct. at 3039 (citation omitted).
 
 
 38
 No case, before the present one, has been cited to us, nor have we found any, in which a court has considered what process is due an inmate placed on a dry cell watch. Nor is there any preexisting law which would have indicated any apparent unlawfulness of the failure, during the watch, to provide a prisoner placed on such a watch with notice of the reason for that action, an opportunity to respond, and consideration of the response.
 
 
 39
 This absence of decisional law or regulatory requirement is probative of the question whether a right is clearly established. Alexander v. Perrill, 916 F.2d at 1398. Following Hewitt, the defendants reasonably could have believed that a post-watch hearing met constitutional requirements. Because the impropriety of the defendants' conduct was not clearly established before this case, the defendants are entitled to qualified immunity.
 
 
 40
 E. Liberty Interest Created by Visitation Regulations
 
 
 41
 Mendoza argues that Washington state administrative rules, and prison regulations, concerning visitation policy create a liberty interest protected by the fourteenth amendment. He contends the defendants violated this interest by suspending his wife's and children's visitation for 90 days.
 
 
 42
 As with the dry cell watch policy, a state created liberty interest exists only when the regulations contain substantive predicates and explicitly mandatory language. In Kentucky Dep't of Corrections, 490 U.S. 454, 109 S.Ct. 1904, the Supreme Court considered whether Kentucky prison regulations created a liberty interest in receiving visitors. The regulation stated in part that "[a]lthough administrative staff reserves the right to allow or disallow visits, it is the policy of the Kentucky State Reformatory to respect the right of inmates to have visits in the spirit of the Court decisions and the Consent Decree, while insuring the safety and security of the institution." Id. at 457, 109 S.Ct. at 1906. It also contained a nonexhaustive list of nine specific reasons for excluding visitors. Id.
 
 
 43
 The Court stated that these regulations provided certain "substantive predicates" to guide the decisionmaker, such as the statement that visitors could be excluded when officials found reasonable grounds to believe that the "visitor's presence in the institution would constitute a clear and probable danger to the institution's security or interfere with [its] orderly operation." Id. at 463, 109 S.Ct. at 1910. However, the Court went on to hold that the regulations did not contain sufficient explicit mandatory language to create a protected liberty interest. "The overall effect of the regulations is not such that an inmate can reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions." Id. at 464-65, 109 S.Ct. at 1910-11.
 
 
 44
 The present case is distinguishable from Kentucky Dep't of Corrections. Here, we focus upon the procedures for suspension and termination of visitation rights, and not on Washington or prison visitation policy in general, because this is the language relevant to the prison official's decision to exclude Mrs. Mendoza. See id. at 464 n. 4, 109 S.Ct. at 1910 n. 4 (focus must be upon relevant mandatory language).
 
 
 45
 The prison's Institutional Order 16.120(VI)C provides in pertinent part that
 
 
 46
 1. A visit may be denied or terminated and visiting privileges suspended under the following circumstances:
 
 
 47
 . . . . .
 
 
 48
 e. Violation of institutional visiting rules by visitor.
 
 
 49
 . . . . .
 
 
 50
 h. Other reasons for denying, terminating, or suspending a visit as reasonably necessary to reserve the security of the institution and reasonable order in the Visiting Area.
 
 
 51
 . . . . .
 
 
 52
 2. Based upon information provided by staff, the inmate and/or visitor, the the [sic] Superintendent or his designee may remove an individual's name from an Approved Visiting List for a specified period, indefinitely or permanently. A written notice of the decision shall be given to the inmate and to the visitor. The statement of reasons may be deleted or limited in details.
 
 
 53
 . . . . .
 
 
 54
 4. Visiting privileges shall be denied only by orders from the Superintendent or his designee. When the suspension is imposed as part of a formal disciplinary proceeding, the Superintendent or his designee will have final approval. (Visiting may be suspended as a disciplinary sanction only when the offense specifically involves visiting.) A visitor who has had his/her visiting privileges suspended may submit written statements in opposition to the suspension.
 
 
 55
 . . . . .
 
 
 56
 In addition to this institutional order, Washington Administrative Code § 275-80-930 provides that the visiting rights of a prisoner may be suspended
 
 
 57
 only after a finding of guilt pursuant to a regular disciplinary hearing and such rights may be abridged for a maximum duration of 90 days after which visiting rights shall be restored unless there remains a clear and present, or imminent danger to the health and safety of any visitor, resident or staff member.
 
 
 58
 These regulations contain the "substantive predicates" necessary to the creation of a liberty interest. Visiting rights may be suspended "only after a finding of guilt pursuant to a regular disciplinary hearing." Visiting privileges may be denied under an enumerated list of circumstances. "A written notice of the decision shall be given to the inmate and to the visitor."
 
 
 59
 Unlike the prison regulations in Kentucky Dep't of Corrections, the regulations in this case contain explicit mandatory language. Prison officials may suspend visiting privileges only after a finding of guilt. Written notice shall be given. The regulations do not provide that the administrative staff "reserves the right" to allow or disallow visits. Thus, an inmate may reasonably form an objective expectation that visiting privileges will not be suspended without compliance with the applicable rules. Cf. Kentucky Dep't of Corrections, 490 U.S. at 464-65, 109 S.Ct. at 1910-11.
 
 
 60
 F. What Process is Due?
 
 
 61
 To determine what process is due, it is necessary once again to turn to the factors set out in Mathews v. Eldridge.
 
 
 62
 Mendoza's private interest in uninterrupted visits from his wife and children is relatively minor in this case. The suspension was limited to 90 days. It did not affect Mendoza's rights to parole, good time credits, or privileges in the prison. Prison officials, on the other hand, have a strong interest in preventing visitors from smuggling drugs into the prison.
 
 
 63
 Finally, Mendoza was given an informal infraction hearing. He was initially found guilty of attempting to smuggle contraband into the prison, and his visitation privileges with his wife and children were suspended for 90 days. The infraction was subsequently dismissed, but the suspension of Mendoza's visitation privileges with his wife and children was continued for the 90-day period. These visitation privileges were not reinstated because of the circumstances under which the balloon had been discovered, and Mrs. Mendoza's prior conduct. The Mendoza children had been the only people in the area where the balloon was found, and Mrs. Mendoza had tried to smuggle contraband to her husband in the prison on prior occasions.
 
 
 64
 Mendoza argues that when the defendants refused to reinstate his visitation privileges after the infraction charge against him had been dismissed, they violated Washington Administrative Code § 275-80-930. He contends that under this code section his visitation rights could be suspended "only after a finding of guilt pursuant to a regular disciplinary hearing." He argues he was cleared of the charges, and thus the visitation rights should have been reinstated. We reject this argument.
 
 
 65
 Prison officials have the right to suspend the visiting privileges of a visitor who attempts to smuggle drugs into the prison regardless of the guilt or innocence of the prisoner being visited. See Wash.Admin.Code § 275-80-900(1) (a visitor may not bring contraband into an institution). Visitors may attempt to smuggle drugs into a prison without the knowledge or consent of the inmate. It is irrelevant that the infraction charge against Mendoza was eventually dismissed. The visitation privileges were suspended because of Mrs. Mendoza's actions. She is not a party in this action, and Mendoza does not have standing to assert her rights. See Powers v. Ohio, --- U.S. ----, ----, 111 S.Ct. 1364, 1370-71, 113 L.Ed.2d 411 (1991) (litigants generally cannot rest a claim to relief premised on the rights of third parties).
 
 AFFIRMED.[7]
 
 
 [1]
 We use the term "dry cell" policy interchangeably with the term "feces watch" policy
 
 
 [2]
 The parties agreed that a magistrate would decide the cross-motions for summary judgment
 
 
 [3]
 Mendoza's complaint also alleged that the implementation of the dry cell policy violated his first, fourth, eighth and ninth amendment rights. The district court dismissed these claims, and Mendoza has not appealed their dismissal
 
 
 [4]
 A new procedure, "Dry Cell Search Procedure," WSP 420.311, has been in effect since March 7, 1990. The new procedure is considerably more lenient than the one in effect at the time of this incident; inmates may receive personal mail, file emergency court papers, wear a religious medallion and wedding ring, have one paperback book, magazine, or paper and pencil, use a blanket, and make emergency telephone calls. WSP 420.311(VII)F.2. The new procedure has mooted Mendoza's claim for injunctive relief
 
 
 [5]
 A thermometer was located at the front of Mendoza's cell. The temperature ranged between 78-82 degrees during the course of the watch. The prison regulation required that the cell temperature be at least 68 degrees Fahrenheit
 
 
 [6]
 Mendoza also argues that the prison violated its own former dry cell policy when it continued the watch after Mendoza completed his third bowel movement. We disagree. The former dry cell watch procedure stated that the search "shall normally" be concluded within 84 hours of a prisoner's placement on watch, or after the equivalent of three normal bowel movements, whichever occurs first. Former I.O. 09.053. Mendoza had his third bowel movement at 10:56 a.m., but was held an additional nine hours and after two more bowel movements
 The "shall normally" language gave prison officials some leeway to hold a prisoner for more than three bowel movements if within the 84-hour period. It is only in cases where the inmate "has not had the equivalent of three normal bowel movements within the 84-hour period" that the superintendent must authorize further 24-hour extensions. Id.
 
 
 [7]
 The plaintiff-appellant/cross-appellee was well represented in this appeal by Kristin Bjorkman and Thomas G. Myrum, legal interns at the University of Idaho College of Law