Loren J. LARSON, Jr., Appellant,

v.

Allen COOPER, former Director, State of Alaska, Department of Corrections, Division of Institutions, and Thomas Reimer, Assistant Superintendent, Spring Creek Correctional Center, Appellees.

No. S–10708.

Supreme Court of Alaska.

May 27, 2005.

Rehearing Denied July 8, 2005.

See also 90 P.3d 125.

Loren J. Larson, Jr., pro se, Seward.

Timothy W. Terrell, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Loren J. Larson, Jr., a state prisoner, appeals the superior court's summary judgment order dismissing his constitutional tort claim against two Department of Corrections officials for depriving him of contact visits in retaliation for his exercise of free speech, religion, and due process. Because Larson failed to offer evidence raising an inference of retaliatory conduct and the prison's uncontroverted evidence indicates that the visitation restrictions were taken for legitimate reasons, we affirm the superior court's order.

## II. FACTS AND PROCEEDINGS

Loren J. Larson, Jr., is an inmate at the maximum-security Spring Creek Correctional Center in Seward. On September 20, 1999, Larson and his wife held hands during a contact visit. Correctional Officer Larry Davis twice ordered Larson to release his wife's hand, and Larson twice replied, "I can't do that." As a result of the incident, Officer Davis filed a disciplinary report against Larson for refusing to obey a direct order of a staff member. In addition, acting Superintendent Thomas Reimer issued an administrative order (an "Individual Determination Restriction"), restricting Larson to secure (no-contact) visitation.

On October 4, 1999, Reimer conducted his monthly review of inmates' administrative restrictions and decided to continue Larson's contact-visitation restriction. That same day, Disciplinary Hearing Officer Harold Faust conducted a hearing and found Larson not guilty of disobeying a direct order. Faust's written finding did not explain the decision, and his reasons were not established during the proceedings below.

The following day, October 5, Larson sent Reimer a written request for reinstatement to contact-visit status, informing Reimer that he had been found not guilty on the disciplinary charge. Reimer responded on October 6, stating, "The Individual Determination Restriction is an administrative action as a direct result of you failing to follow the direction of the officer in the visiting room. Your situation will be reviewed every 30 days."

On October 19 Larson submitted a formal prisoner grievance, which detailed the circumstances surrounding his contact-visit restriction, emphasized that he had been found not guilty in the disciplinary proceeding, and asked to have his visiting privileges reinstated.

A week later, on October 26, Larson sent Reimer another written request concerning the status of his administrative restriction, asking whether Reimer had "return[ed] to me my Contact Visits on 10–20–99 'the 30 day Review'?" Reimer responded a day later, saying "The review has not been done yet." Larson immediately sent another memo, requesting "a detailed explanation as to why my 'individual determination' has not been reviewed yet." Reimer wrote back, "Because I have not reviewed them yet this month."

On October 31 Larson submitted a second prisoner grievance, accusing Reimer of retaliating against Larson for having filed his October 19 grievance:

> On 10–19–99 I filed a Grievance for the wrongful[ ] termination of a contact visit between my family and my self. My contact visits are now being held hostage by assistant superintendent T. Reimer in retaliation to my Grievance.

On November 1 Reimer conducted his next monthly review of administrative restrictions and left Larson's no-contact restriction intact. Larson sent Reimer another request on November 7, inquiring whether Reimer had restored Larson's contact visits on November 1. Reimer replied the next day, "Not at this time. Should be return[ed] at the end of Nov."

Meanwhile, Larson's grievances had been investigated by separate corrections officers, who both recommended that no further action was needed; Reimer approved these recommendations on November 5. Larson appealed the denial of his grievances to the Director of Institutions, Allen Cooper. Cooper denied Larson's appeals on November 16. Addressing the first grievance, in which Larson complained about his treatment in connection with the original hand-holding incident, Cooper found: "You were warned about holding hands. When you failed to stop, your visit was terminated. The incident happened. The fact you were found 'not guilty' does not change that. The visiting restrictions are appropriate." In rejecting the second grievance, which complained of retaliation by Reimer, Cooper simply found that no retaliation had occurred, further noting: "Your restrictions are being reviewed every 30 days. No further action is necessary."

After conducting his next monthly review of administrative restrictions on December 1, 1999, Reimer restored Larson's contact visiting privileges. Larson's contact visits were

thus suspended for a total of seventy-three days.

In August 2000 Larson filed a superior court complaint against Reimer and Cooper, alleging that they had violated his constitutional rights by suspending his contact visits to retaliate against him for holding hands with his wife in furtherance of his religious rights, for contesting his disciplinary charges and being acquitted, and for pursuing his ensuing grievances.

The superior court granted the state's motion for summary judgment, ruling that Larson's claims failed as a matter of law because Larson had no liberty interest in contact visitation and had failed to make a prima facie showing of retaliation.

Larson appeals.[1]

## III. DISCUSSION

■■■ We review a grant of summary judgment de novo.[2] Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[3] To determine whether the moving party has a right to judgment as a matter of law, we draw all reasonable factual inferences in favor of the non-moving party.[4]

Because Larson asserts federal rights, we look to the United States Supreme Court for guidance. Although the Court has yet to determine the proper standard for adjudicating claims that a prison official has retaliated against a prisoner for constitutionally protected conduct, the Court has addressed retaliation claims in the employment context.[5] In *Mt. Healthy City School District Board of Education v. Doyle*, the Court evaluated a plaintiff's claim that his employer, a municipal school district, fired him in retaliation for the exercise of his first amendment rights. The Court determined that when adverse action by the state is influenced by both proper and improper motives, the action may be sustained upon a showing that the state would have taken the same action, even in the absence of the improper reason.[6] When alleging a retaliatory employment action, the plaintiff carries the initial burden of showing that an improper motive played a substantial part in the state's action. If the plaintiff makes this showing, the burden shifts, and the defendant must show that the state would have taken the same adverse action against the claimant regardless of the improper motive.[7]

In adjudicating retaliation claims in the prison context, the federal courts of appeals have recognized that "courts must approach prisoner claims of retaliation with skepticism and particular care ... because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."[8] As a result, where an inmate alleges retaliation, the federal courts have looked to *Mt. Healthy* for direction but have typically placed a more demanding burden on the claimant.[9]

Although the elements of a prison retaliation claim differ slightly from circuit to circuit, the federal courts generally require proof: (a) that the inmate engaged in constitutionally protected conduct; (b) that prison officials took adverse action; (c) that these

---

1. This is Larson's third appeal arising from the hand-holding incident and the resulting suspension of his contact visits. We resolved the first two appeals in *Larson v. Cooper*, 90 P.3d 125 (Alaska 2004).

2. *E.g., Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 585 (Alaska 2001).

3. *E.g., id.* at 585–86.

4. *E.g., id.* at 586.

5. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

6. *Id.* at 287, 97 S.Ct. 568.

7. *Id.*

8. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (partially overruled on other grounds); *see also Smith v. Campbell*, 250 F.3d 1032, 1039 (6th Cir.2001) ("Courts afford prison administrators wide ranging deference in their judgments needed to preserve internal order and discipline and to maintain institutional security.").

9. *See, e.g., Goff v. Burton*, 7 F.3d 734, 737–38 (8th Cir.1993).

actions served a retaliatory purpose;[10] and usually—in most circuits—(d) that the adverse action would not have been taken in the absence of the protected conduct.[11]

But the circuits differ in allocating the burden of proving these elements. Some circuits (the Second, the Third, and the Sixth) follow the *Mt. Healthy* approach and, once the prisoner has raised an inference that the protected conduct was a substantial factor motivating the adverse action, shift the burden to the prison to show that the officials would have taken the action absent the protected conduct.[12] Other circuits (the First, Fifth, Eighth, and Tenth), noting "the increasingly urgent problems of prison administration" and "that great deference must be accorded to the administrative determinations of prison officials,"[13] have declined to adopt the burden-shifting approach. In these circuits, the inmate bears the burden of showing that the prison officials would not have taken the adverse action "but for" the protected conduct.[14] Finally, some circuits (the Seventh, Ninth, and Eleventh) have taken neither approach, analyzing retaliation claims in a more ad hoc manner.[15]

■ We assume for purposes of discussion that suspending Larson's contact visits impaired his liberty, amounting to adverse action.[16] Our inquiry thus centers on whether Larson offered admissible evidence raising a reasonable inference that he engaged in constitutionally protected conduct and that his contact visits were curtailed because of that conduct. In response to the defendants' motions for summary judgment, Larson asserted that he lost his right to contact visits for holding hands with his wife, declining to stop upon Officer Davis's command, successfully defending against Davis's ensuing disciplinary charges, and filing grievances against Reimer and Cooper—all of which, Larson asserts, involved constitutionally protected conduct.

But only two of these activities implicate constitutionally protected rights. While Larson insists that holding his wife's hand and refusing to let go qualified as protected conduct because it involved an exercise of his religious freedom, we recently rejected a similar argument by Larson in a related appeal involving the same conduct.[17] Our decision there is binding. Accordingly, we

**10.** (Listed in order by circuit) *See, e.g., McDonald v. Hall,* 610 F.2d 16, 18 (1st Cir.1979); *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002); *Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir.2003); *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994); *Freeman v. Texas Dep't of Criminal Justice,* 369 F.3d 854, 863 (5th Cir.2004); *Thaddeus X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999); *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996); *Moore v. Plaster,* 266 F.3d 928, 931 (8th Cir. 2001); *Rhodes v. Robinson,* 380 F.3d 1123, 1130 (9th Cir.2004); *Smith v. Maschner,* 899 F.2d 940, 949–50 (10th Cir.1990).

**11.** (Listed in order by circuit) *See, e.g., Layne v. Vinzant,* 657 F.2d 468, 475 (1st Cir.1981); *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir.2001); *Clarke v. Stalder,* 121 F.3d 222, 231 (5th Cir.1997), *opinion vacated and relevant parts reinstated in,* 154 F.3d 186, 191 (5th Cir.1998); *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir.1995); *Thaddeus–X,* 175 F.3d at 399 (6th Cir.1999); *Babcock,* 102 F.3d at 275 (7th Cir.1996); *Cornell v. Woods,* 69 F.3d 1383, 1388 (8th Cir.1995); *Peterson v. Shanks,* 149 F.3d 1140, 1144 (10th Cir.1998).

**12.** (Listed in order by circuit) *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Graham v. Henderson,* 89 F.3d 75, 79 (2d. Cir.1996); *Rauser,* 241 F.3d at 333 (3d Cir.2001); *Thaddeus–X,* 175 F.3d at 399 (6th Cir.1999).

**13.** *Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir.1990).

**14.** (Listed in order by circuit) *Layne,* 657 F.2d at 475 (1st Cir.1981); *McDonald,* 610 F.2d at 18 (1st Cir.1979); *Clarke,* 121 F.3d at 231 (5th Cir. 1997); *Woods,* 60 F.3d at 1166 (5th Cir.1995); *Cornell,* 69 F.3d at 1388 (8th Cir.1995); *Goff,* 7 F.3d at 738 (8th Cir.1993); *Ponchik v. Bogan,* 929 F.2d 419, 420 (8th Cir.1991); *Peterson,* 149 F.3d at 1144 (10th Cir.1998); *Smith,* 899 F.2d at 949 (10th Cir.1990).

**15.** (Listed in order by circuit) *See, e.g., Babcock,* 102 F.3d 267 (7th Cir.1996); *Howland v. Kilquist,* 833 F.2d 639 (7th Cir.1987); *Bruce v. Ylst,* 351 F.3d 1283 (9th Cir.2003); *Hines v. Gomez,* 108 F.3d 265 (9th Cir.1997); *Pratt v. Rowland,* 65 F.3d 802 (9th Cir.1995); *Farrow v. West,* 320 F.3d 1235 (11th Cir.2003); *Adams v. Wainwright,* 875 F.2d 1536 (11th Cir.1989).

**16.** *Cf. Mendoza v. Blodgett,* 960 F.2d 1425, 1432 (9th Cir.1992) (visiting rights provided for by regulation can give rise to liberty interest in visitation).

**17.** See *Larson,* 90 P.3d at 128.

find no persuasive ground to support Larson's claim that these actions amounted to constitutionally protected conduct.[18] In contrast, Larson's conduct in defending himself against the disciplinary charges and pursuing his grievances against Reimer and Cooper undisputedly involved protected activities.[19]

In addition to showing that he engaged in constitutionally protected conduct, Larson was also required to offer evidence showing adverse action prompted by a retaliatory motive. The superior court ruled that Larson failed to make this showing and therefore granted summary judgment for the defendants. The state agrees and urges us to affirm the superior court's decision. Alternatively, the state argues that even if Larson raised an inference of a retaliatory motive, the prison has offered unrebutted evidence that it also had legitimate reasons for continuing to restrict Larson's contact visits.

■ The federal courts have recognized a "presumption that a prison official's acts to maintain order are done for a proper purpose."[20] Where a prison can show that legitimate reasons existed for taking an adverse act, the courts presume, absent persuasive evidence to the contrary, that officials in fact took the action for the offered reasons.[21] The standard of proof for showing the existence of legitimate reasons differs from circuit to circuit. In the Eighth Circuit, for example, the prison need merely introduce "some evidence" that the adverse action was justified.[22] In contrast, the Second Circuit has held that where the state claims a legitimate reason based on the inmate's conduct, the inmate offers a conflicting account of the conduct, and the official action would not have been justified under the inmate's account, there are material facts in dispute, so summary judgment is not appropriate.[23] The Ninth Circuit has similarly ruled that "some evidence" of a legitimate reason will not warrant summary judgment when the inmate's evidence raises "a genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a constitutional right."[24]

Larson insists that the prison did not have a legitimate reason for extending the visiting restrictions, pointing to his acquittal at the disciplinary hearing, the alleged inadequacy of the defendants' explanations for failing to reinstate his contact visitation privileges after the acquittal, and his clean record at the correctional center before the hand-holding incident. The prison contends that the disciplinary acquittal is irrelevant and that the prison's reasons for continuing the restrictions were legitimate. The prison notes that Larson repeatedly admitted that he failed to

---

**18.** *Thaddeus-X,* 175 F.3d at 395 ("[B]ecause prison regulations are allowed to infringe on prisoners' rights as long as they are rationally related to a legitimate penalogical concern ... if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct[.]' ").

**19.** Both entailed an exercise of the right to petition the government for the redress of grievances guaranteed by the First and Fourteenth Amendments. *Dawes,* 239 F.3d at 492; *Herron v. Harrison,* 203 F.3d 410, 415 (6th Cir.2000) ("An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."); *Graham,* 89 F.3d at 80 ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances.").

**20.** *Hynes,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)).

**21.** *See, e.g., Vance v. Barrett,* 345 F.3d 1083, 1093 (9th Cir.2003) (noting that courts should "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate

penological reasons for conduct alleged to be retaliatory") (citation omitted).

**22.** *Goff,* 7 F.3d at 739. *See also Moore,* 266 F.3d at 931 ("[A] defendant may successfully defend a retaliatory-discipline claim by showing 'some evidence' that the inmate actually committed a rule violation."); *Henderson v. Baird,* 29 F.3d 464, 469 (8th Cir.1994) ("The critical inquiry ... is whether the prison disciplinary committee ultimately found based upon some evidence that the prisoner committed the charged violation of the prisoner regulations.").

**23.** *Gayle,* 313 F.3d at 684 ("It is therefore disputed whether [the inmate] committed all of the prohibited conduct, and, more important, whether he committed the most serious of the conduct.... The defendants therefore at this stage of the proceeding have not met their burden of establishing as a matter of law that [the inmate] would have been punished to the same extent ... in the absence of a retaliatory motive.").

**24.** *Bruce v. Ylst,* 351 F.3d at 1289.

obey the order to stop holding his wife's hand, and that nothing in the disciplinary ruling included a finding that Larson did not in fact disobey an order.[25] Reimer and Officer Davis submitted affidavits disclaiming any retaliatory motive and averring that Larson's contact visits were suspended as a routine administrative matter because he had disobeyed a direct order to stop holding hands with his wife. In particular, the state maintains that Reimer continued the restrictions because of a concern that "Larson's demonstrated unwillingness to follow staff orders related to the contact visiting rules showed that Larson's continued retention of contact visiting privileges posed a security threat so long as Larson maintained this unwillingness." In other words, the prison argues that the reasons motivating the initial restriction—the officials' concern that Larson was unwilling to follow orders regarding visiting rules—still existed when the restrictions were continued and that those reasons remained legitimate. The prison thus maintains that its uncontradicted evidence establishing that Larson actually did refuse to obey a guard's order meets its burden of proving that it would have taken the same action even in the absence of .the alleged retaliatory motives and that "Larson failed to show that this explanation was pretextual."

The state's argument on this point is persuasive: our survey of federal case law convinces us that the state would prevail on its motion for summary judgment in any circuit.

Although we find it unnecessary to consider the facts of the present case in light of the idiosyncracies of each of the circuits, the approaches of the Second, Ninth, and Tenth Circuits cast particular light on the problems with Larson's claim, so we will consider them in greater detail.

The Second Circuit follows the *Mt. Healthy* burden-shifting approach, a relatively inmate-friendly approach; but on our reading of the Second Circuit's rulings, the state would still prevail here under that approach. In the Second Circuit, the state can meet its burden of showing that it would have taken the adverse action absent the protected conduct by establishing the claimant's actual participation in prohibited conduct.[26] When undisputed proof of an inmate's actual participation in prohibited conduct appears in the record, these cases hold that summary judgment may properly be granted for the state.[27]

The Second Circuit's ruling in *Lowrance v. Achtyl* aptly illustrates this line of authority.[28] There, a prison guard, Achtyl, had stopped an inmate, Shamsid–Deen, for bringing improper food items into a mess hall.[29] Achtyl commanded Shamsid–Deen to hand over his prohibited food.[30] Shamsid–Deen refused.[31] Achtyl placed Shamsid–Deen in administrative confinement.[32] Shamsid–Deen then repeatedly complained to various officials, but received no response and re-

25. The prison argues that the hearing officer's "Summary Finding" that Larson was not guilty of the infraction of disobeying an order did not amount to a finding that Larson had not in fact disobeyed the order. The prison argues that a summary finding is akin to a Criminal Rule 43(a) dismissal which "does not mean that the defendant did not commit the crime—the case may have been dismissed for any number of different reasons not related to the accuracy of the underlying factual assertions, such as an invalid search. . . . The 'not guilty' language on the summary finding form does not provide clear evidence of any particular findings of historical fact made by [the hearing officer], and in light of Larson's repeated admissions that he did not follow [the] order, there is no basis to presume that [the hearing officer] made such a finding."

26. *See, e.g., Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.1998), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998) (noting that

defendants could meet "their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct" by showing that " 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report") (internal citations omitted).

27. *See, e.g., Hynes*, 143 F.3d at 657; *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994).

28. 20 F.3d 529.

29. *Id.* at 531.

30. *Id.*

31. *Id.*

32. *Id.*

mained in confinement.[33] Achtyl subsequently filed a behavior report charging Shamsid–Deen with disobeying his order.[34] A disciplinary officer eventually dismissed Shamsid–Deen's charge of disobeying Achtyl's order, finding that the food rule that prompted Achtyl to direct Shamsid–Deen to surrender his plate had not been properly publicized.[35]

After being acquitted of disciplinary charges for disobeying Achtyl's order, Shamsid–Deen filed a civil action against Achtyl, accusing him of retaliation. In support of his claim, Shamsid–Deen submitted an affidavit establishing that, before filing the misbehavior charges against Shamsid–Deen, Achtyl had been overheard to say that he "could write better misbehavior tickets than Shamsid–Deen could write grievances." [36] Despite this evidence, a federal magistrate-judge dismissed the retaliation claim on summary judgment.[37]

In affirming this summary judgment order, the Second Circuit held that—even though Shamsid–Deen's disciplinary charges had been dismissed—Achtyl met his burden of showing that the misbehavior report would have been filed and Shamsid–Deen would have been administratively confined, because it was undisputed that Shamsid–Deen had in fact engaged in prohibited conduct by disobeying Achtyl's direct order.[38] Under this rule, then, the undisputed evidence of Shamsid–Deen's prohibited conduct (the state's le-

gitimate reason for adverse action) required the court to presume that the state would have acted as it was legitimately entitled to act even though there was ample evidence suggesting that impermissible motives also might have prompted the state to take adverse action.

The situation in the present case is similar to the one addressed in *Lowrance.* Larson's visitation privileges were administratively restricted, and this restriction was twice extended, for disobeying a correctional officer's direct order. Larson freely admits that he refused to heed Officer Davis's direct orders to stop holding hands with his wife. As happened in *Lowrance,* Larson's disciplinary charge was ultimately dismissed. Relying on this acquittal, Larson now questions whether his conduct amounted to disobedience of a direct order. Asserting that handholding was permissible under the regulations in effect at the time, he challenges the underlying basis for Officer Davis's order to stop holding hands.

But Officer Davis's basis for issuing his order has no bearing on Larson's legal duty to comply with that order; nor does Larson's acquittal in the disciplinary proceeding alter the fact of his repeated admissions that he disobeyed Davis's direct order.[39] As recognized in *Lowrance,* neither the underlying basis for a prison guard's order nor a disciplinary acquittal will alter the significance of a prisoner's reliable admission of conduct

**33.** *Id.* at 531–32.

**34.** *Id.* at 532.

**35.** *Id.*

**36.** *Id.*

**37.** *Id.*

**38.** *Id.* at 535.

**39.** Although Larson denies disobeying Officer Davis's order, his stance is premised on the notion that he had no duty to obey, because he was engaging in constitutionally protected conduct. Yet Larson cites no authority suggesting that a prisoner's obligation to obey a prison guard's order depends on the validity of that order. And we have found no authority suggesting that an inmate's duty to obey is limited or conditional. We assume that disobedience might be excused

on constitutional grounds in certain truly extraordinary situations. But the circumstances of the present case make it unnecessary to decide that issue. As already noted, Larson's act of holding hands with his wife did not amount to a constitutionally protected exercise of his religious freedom. Furthermore, neither the order at issue here—to stop holding hands—nor the nature of the potential disciplinary and administrative consequences of disobedience fall close to the limits of constitutionally permissible punishment. *See, e.g., Green v. State,* 390 P.2d 433, 435 (Alaska 1964) ("Only those punishments which are cruel and unusual in the sense that they are inhuman and barbarous, or so disproportionate to the offense committed as to be completely arbitrary and shocking to the sense of justice may be stricken as violating the due process clauses of the state and federal constitutions."); *see also State v. Niedermeyer,* 14 P.3d 264, 268 (Alaska 2000); *Thomas v. State,* 566 P.2d 630, 635 (Alaska 1977).

amounting to disobedience of an order.[40] Or as Cooper more bluntly put it in denying Larson's grievance appeal, "The incident happened. The fact you were found 'not guilty' does not change that. The visiting restrictions are appropriate."

Under Second Circuit law, Larson's admitted disobedience of an officer's direct order would establish a legitimate reason for his administrative restriction. In the absence of case-specific evidence indicating that Reimer would have lifted the visitation restrictions if Larson had not been charged and acquitted of the disciplinary violation, or if he had not pursued his grievances, the strong "presumption that a prison official's acts to maintain order are done for a proper purpose"[41] would compel the conclusion that the reasons cited by the officials in fact motivated their actions and that Larson would have received the same treatment even if he had not engaged in protected conduct. Since Larson offered no admissible evidence to rebut this presumption—that is, evidence tending to show that Reimer would not have extended the no-contact restrictions in the absence of Larson's acquittal and subsequent grievances[42]—he has failed to raise a genuine dispute as to any *material* fact, and, under the Second Circuit's test, his retaliation claim would be vulnerable to dismissal on summary judgment.[43]

The Ninth Circuit's case of *Bruce v. Ylst*[44] and the Tenth Circuit's case of *Smith v. Maschner*[45] provide examples of the sort of evidence an inmate must offer to rebut the presumption that the legitimate reasons cited by a prison official actually motivated his action.

The prison in *Bruce* had a policy of housing gang members in a Security Housing Unit.[46] In order to determine whether an inmate was a gang member, the Institutional Gang Investigator would investigate alleged gang members.[47] If the investigator found sufficient evidence, he would "validate" the prisoner as a gang member. In 1995 and 1996 Bruce was investigated to determine whether he should be validated as a member of the Black Guerrilla Family. In both cases the gang investigator determined that although there was evidence in his file linking him to the Family, the evidence was insufficient to conclude that he was a member of the gang.[48]

In 1998, while in administrative segregation for an unrelated incident, "Bruce filed a series of grievances."[49] Soon after, Bruce met with the gang investigator, who informed Bruce that he was being validated as a gang member.[50] Bruce alleged that the investigator told Bruce that he was being

**40.** *Lowrance,* 20 F.3d at 532–35.

**41.** *Hynes,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)).

**42.** Because Reimer suspended Larson's contact visits before his disciplinary hearing and thereafter extended this restriction in the course of his regularly established monthly review, his periodic renewal of the restrictions does not in itself negate the presumption that Reimer would have imposed the same administrative restrictions in the absence of protected conduct. Nor does Larson's disciplinary acquittal negate the presumption of regularity. We have never ruled that an acquittal in a prison disciplinary proceeding has binding effect in the context of a correctional facility's routine administrative treatment of inmates. Cases elsewhere establish no clear guidance on this point. And we find nothing suggesting that the Department of Corrections has historically viewed disciplinary rulings as binding in the administrative context. Under these circumstances, and given Larson's unequivocal admission of conduct amounting to disobedience, the naked fact of Larson's acquittal in the disciplinary hearing does not, in our view, create a reasonable inference that he might have been given more lenient administrative treatment had he not been acquitted in the disciplinary proceeding.

**43.** Larson separately argues that Reimer's and Cooper's actions violated his constitutional right to substantive due process. We need not address these arguments here, since we recently rejected similar claims in *Larson,* 90 P.3d at 135–36.

**44.** 351 F.3d 1283 (9th Cir.2003).

**45.** 899 F.2d 940 (10th Cir.1990).

**46.** *Bruce,* 351 F.3d at 1287.

**47.** *Id.* at 1286.

**48.** *Id.*

**49.** *Id.*

**50.** *Id.* at 1287.

validated on the orders of "higher-ups" in retaliation for his having filed the grievances and that the evidence relied upon was the evidence that had already been in his file.[51] As a result of his validation as a gang member, the Institutional Classification Committee placed Bruce in "indeterminate confinement at the Pelican Bay Security Housing Unit." [52]

Bruce brought both a due process and a retaliation claim against the prison, alleging that he had been validated as a gang member in retaliation for grievances he had filed against prison officials.

The Ninth Circuit affirmed the lower court's grant of summary judgment on the due process challenge. The court held that as long as the prison could present "some evidence" in support of Bruce's validation as a gang member, the due process claim failed. It concluded that the evidence in Bruce's file, though admittedly "stale" and previously deemed insufficient,[53] was some evidence that Bruce "had ties to" the Black Guerrilla Family.[54]

But the Ninth Circuit reversed the grant of summary judgment on the retaliation claim. The court held that in a retaliation claim, the prison was required to offer more than "some evidence" that it had legitimate reasons for its action.[55] Even if there was some evidence to support the conclusion that Bruce was a gang member,

> if ... the defendants abused the gang validation procedure as a cover or a ruse to silence and punish Bruce because he filed grievances, they cannot assert that Bruce's validation served a valid penological purpose, even though he may have *arguably* ended up where he belonged.[56]

The court noted the timing of the validation, the fact that the evidence relied upon "was previously determined to be insufficient to conclude that [Bruce] was a BGF member," [57] and that Bruce "asserted facts ... that, if true, show that [the IGI's] accusation of gang activity was improperly motivated." [58] The court held that in light of the evidence and the allegations, the prison's presentation of "some evidence" supporting the charges was insufficient to justify the grant of summary judgment. "Because Bruce raised a jury issue that the stated penological goals were not legitimate, summary judgment was not appropriate on the retaliation claim." [59]

As in *Bruce*, the inmate in *Smith v. Maschner* presented sufficient evidence to overcome the "substantial deference" that "is to be accorded to the prison authorities." [60] Smith was a jailhouse lawyer.

Officials searched Smith's briefcase before he left his cell for a trip to state court for a hearing. Smith then walked in shackles to the bus taking him to court, at which point officials ordered him to submit to another search of his briefcase. According to Smith, he had never before been required to submit to a second search under these circumstances. Smith disobeyed two orders to open his briefcase, and officers then told him he would have to leave his briefcase at the prison if he did not submit to the search. Once in court, Smith informed the judge that he could not proceed without the papers in his briefcase. The judge ordered prison officials to retrieve the case from the prison. When the briefcase arrived, it was opened in court and the hearing proceeded.

Officials placed Smith in "segregation" immediately upon his arrival back at the prison. That same day, they informed him of the disciplinary charges against him, including two charges of disobeying an order, one charge of disrespect, and one

---

**51.** *Id.* at 1287, 1289.

**52.** *Id.* at 1287.

**53.** *Id.* at 1289.

**54.** *Id.* at 1287.

**55.** *Id.* at 1289.

**56.** *Id.* (emphasis in original).

**57.** *Id.* at 1288.

**58.** *Id.*

**59.** *Id.* at 1289–90.

**60.** *Frazier v. Dubois,* 922 F.2d 560, 562 (10th Cir.1990).

charge of possession of unregistered personal property. He was also charged later with violating prison mail regulations and with misuse of state property.[61]

Hearings were held on the charges, and Smith was found guilty of all charges.[62]

Smith brought suit against the prison alleging that the hearings violated his right to due process and that the proceedings "were initiated against him in retaliation for his prior lawsuits against prison officials." [63]

The district court granted summary judgment for the defendants on both claims, but the Tenth Circuit reversed. In his appeal Smith alleged that the prison refused to allow him to call a prison official as a witness and that the disciplinary board was motivated by a desire to retaliate.[64] The court found that prohibiting Smith from calling the witness "effectively denied [Smith] any defense other than his own testimony about the events," and therefore violated his right to due process.[65] The court also found that Smith's allegation that the board was motivated by a desire to retaliate, "if believed, call[s] into doubt whether Smith was given a meaningful opportunity to be heard." [66] The court therefore reversed the grant of summary judgment on the due process claim.

The court similarly reversed the order granting summary judgment on the retaliation claim. Although it was undisputed that Smith had disobeyed the order to open his briefcase,[67] the court noted that "Smith's appearance in court ... and the prison's disciplinary action, taken immediately upon his return from court, were indisputably in close temporal proximity." [68] More important, as the court recognized in addressing Smith's

due process argument, under the specific circumstances at issue, the disobeyed order itself was evidence of the state's effort to impede Smith's access to the courts—although Smith frequently made court appearances, he had never previously been ordered to open his briefcase.[69] Furthermore, the officials' explanations of their actions were internally inconsistent: although the charges specified that the incidents occurred before Smith left for court, one guard reported that the disciplinary action was taken in response to Smith's conduct at court.[70] Finally, Smith presented evidence that an inmate who intended to testify in another of Smith's pending lawsuits had been transferred and that a law clerk who had assisted him had been "removed from library employment." [71] This evidence, coupled with the fact that the hearings on the underlying conduct had been tainted,[72] led the court "to conclude that a jury could reasonably find that defendants retaliated against Smith for the exercise of his right of access to the courts." [73]

In *Maschner* as in *Bruce*, the inmate presented evidence showing more than a chronological link between the state's adverse action and the inmate's engagement in constitutionally protected conduct. In both cases, the inmates offered substantial and specific evidence tending to negate the legitimate reasons offered by the prison officials, thereby raising a genuine factual dispute as to whether the purportedly legitimate reasons were merely pretextual.

Evidence of this kind is crucial in prison cases. Under the rule applied in *Mt. Healthy*, the mere existence of a retaliatory

61. *Smith v. Maschner*, 899 F.2d 940, 945 (10th Cir.1990).

62. *Id.*

63. *Id.*

64. *Id.* at 946–47.

65. *Id.* at 947.

66. *Id.*

67. *Id.* at 945.

68. *Id.* at 948.

69. *Id.*

70. *Id.* at 948 n. 5.

71. *Id.* at 948.

72. *Id.* at 945 n. 2 ("[T]he fairness of the disciplinary proceeding [is] relevant to this case insofar as Smith has relied on this event to substantiate his claim that prison officials acted in retaliation rather than in pursuit of any legitimate penological purpose.").

73. *Id.* at 949.

motive will not warrant relief if the state actors can show that they would have taken the same action absent the retaliatory motive. When combined with the presumption in prison cases that the state's claimed reasons in fact motivated the action, this rule means that an inmate faced with undisputed evidence of a legitimate state reason for adverse action cannot rest his case on mere evidence that a retaliatory motive also existed. If the improper and proper motives might have existed concurrently, the inmate must offer evidence to negate the proper motive—evidence tending to show that, despite the undeniable existence of a legitimate motive, the state's reliance on the motive is merely a pretext.

Both *Maschner* and *Bruce* illustrate this proposition. As shown above, in addition to adducing evidence of a chronological link—which allows an inference of a potentially concurrent retaliatory motive—the inmates in both cases presented substantial, case-specific evidence tending to show that the proper motive claimed by prison officials was pretextual. By presenting this evidence, the inmates overcame the presumption that the proper reasons were the state's actual reasons for taking adverse action.

In Larson's case, in contrast, the only evidence supporting his retaliation claim is the chronology of events. Although this evidence allows an inference that the state had a retaliatory motive, it does not, standing alone, negate or tend to negate the possibility that the state might have simultaneously acted for the legitimate reason asserted by Reimer, namely Larson's actual and admitted disobedience of an order. Nor does any other record evidence tend to rule out this possibility. To be sure, after Reimer became aware that Larson had successfully defended his disciplinary charges and filed his grievances, the visitation restrictions were extended. But, as the prison points out, they were also extended on October 4th, before Reimer was aware that Larson had been found not guilty on the disciplinary charge and before

he filed his grievances. Moreover, Reimer lifted the restrictions at the beginning of December *"after* Larson had filed . . . several grievance appeals." (Emphasis in original.)

Aside from the chronology of events, Larson presents no evidence indicating that the prison's articulated reasons are pretextual. Larson admits that he disobeyed the guard's order, an admission that would ordinarily serve to justify the visitation restrictions. Further, Larson presented no evidence that he was treated differently from similarly situated inmates. Neither did he offer evidence suggesting either that prison officials were not concerned that he would violate visiting rules or that those concerns were unfounded.

Unlike the inmate in *Bruce,* the evidence used against Larson was not stale, and he does not claim that a prison official told him the visitation restrictions were retaliatory. Unlike the inmate in *Maschner,* officer Reimer's explanations were consistent, no witnesses were transferred, and Larson does not allege that his due process rights were infringed at the disciplinary hearing. Given the prison's legitimate reasons for extending the visitation restrictions—Larson's disobedience of an order and the officials' concern that Larson did not intend to respect visitation rules—and the fact that Larson has offered no evidence suggesting that these reasons were pretextual or that the prison's actions were determined or dominated by a retaliatory motive, the strong presumption of regularity has not been overcome.

We thus conclude that the grant of summary judgment was proper.[74]

## IV.  CONCLUSION

We AFFIRM the superior court's judgment dismissing Larson's claim.

---

74. For this reason, we need not decide here whether to adopt the *Mt. Healthy* burden shifting approach or instead to leave the burden on the claimant at all times. Similarly, we need not determine the standard of proof a prison must

meet to show that it had legitimate reasons for its actions. Under any potentially applicable standard, the prison introduced sufficient evidence to show that it had a legitimate reason for continuing to restrict Larson's contact visits.